IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOY LASKAR, Ph.D., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| vs. | : | CIVIL ACTION FILE |
| | : | NO. _____ |
| | : | |
| | : | |
| PHILLIP W. HURD; | : | |
| PATRICK A. JENKINS; JILDA D. | : | |
| GARTON; and MARK G. ALLEN, | : | |
| | : | |
| *Defendants* | : | **JURY DEMAND INCLUDED** |

## COMPLAINT

COMES NOW Joy Laskar, Plaintiff, and for his Complaint against

Defendants Phillip W. Hurd, Patrick A. Jenkins, Jilda D. Garton, and Mark G.

Allen, respectfully shows the Court the following:

## INTRODUCTION

1.

Plaintiff brings this action pursuant to (a) *Title 42 U.S.C. §§ 1983 and 1988,*

(b) the Fourth Amendment to the United States Constitution, and (c) principles of

Georgia law pertaining to the claim of malicious prosecution.  Plaintiff shows that intentionally malicious acts and omissions of the Defendants led directly to and caused the criminal prosecution of Dr. Laskar for the offenses of theft and racketeering.  Plaintiff shows that Defendants initiated their investigation against Dr. Laskar in the face of longstanding practices and procedures at the Georgia Institute of Technology ("Georgia Tech") which plainly demonstrated that Dr. Laskar had committed no wrongdoing. Had such practices and procedures not been willfully ignored, rather taken into account and fairly considered, Plaintiff would have suffered none of the damages Defendants caused him.  Defendants instead initiated and supported an investigatory process leading to the suspension, termination, arrest and criminal prosecution of Dr. Laskar based upon an incomplete, inaccurate and misleading investigatory record. It was a report that they were responsible for creating.  Defendants acted maliciously and without probable cause.

2.

When Defendants began their investigation, Dr. Laskar was an esteemed and internationally prominent electrical engineer and professor serving on the Georgia Tech faculty. Holder of the Georgia Tech Schlumberger Chair in Microelectronics at the School of Electrical and Computer Engineering, Dr. Laskar was focused on the rapidly emerging mixed signal design technology field.  It is a field in which

Dr. Laskar holds over 50 patents. Dr. Laskar was, and is today, an industry leader in the field of 60GHz signal design.

3.

Dr. Laskar is additionally the author of five (5) books and more than 600 peer reviewed journal and conference articles. Prior to the termination of his employment as full Professor, Dr. Laskar simultaneously served as Faculty Advisor to no less than 50 graduate doctoral students. At the time, this was more than any other Georgia Tech professor.

4.

In recognition of Dr. Laskar's scholarship, as reward for his leading-edge research, and in tribute to his extensive mentoring of students and colleagues alike, Dr. Laskar had been the recipient of numerous awards and honors. These recognitions included:

> (a) The Army Research Office Young Investigator Award (1995);
>
> (b) The NASA Invention Award: "Integrated Noise Generator" (1996);
>
> (c) The National Science Foundation CAREER Award (1996);
>
> (d) The National Science Foundation Packaging Research Center Faculty Of the Year Award (1998);

(e) The National Science Foundation Packaging Research Center Educator Of the Year Award (1999);

(f) The Rappaport Award from the Institute of Electrical and Electronics Engineers (1999);

(g) The Georgia Tech Faculty Graduate Student Mentor of the year (2001);

(h) Appointment as Senior Member of the Institute of Electrical and Electronics Engineers (2002);

(i) The Clemson University College of Engineering Young Alumni Award (2003);

(j) The Outstanding Young Engineer Award of the Institute of Electrical and Electronics Microwave Theory and Techniques Society (2003);

(k) The NAE/Humboldt Foundation Featured Speaker for Frontiers of Engineering (2003);

(l) Fellow of the Institute of Electrical and Electronic Engineers (2005);

(m) Distinguished Lecturer in 2006-07 at The Institute of Electrical and Electronics Engineers EDS;

(n) Recipient of Georgia Tech's "Outstanding Faculty Research

Author" Award (2007);

(o)     Recipient of Georgia Tech ECE's Distinguished Mentor Award
        (2008);

(p)     Vice Chair of the Institute of Electrical and Electronics
        Engineers MTT-S Executive Committee (2008-09);
        and

(q)     Chair of the Institute of Electrical and Electronic Engineers
        MTT-S Executive Committee (2010).

5.

In 2003, Dr. Laskar helped to found Georgia Tech's Georgia Electronic
Design Center ("GEDC") and became its first Director.  GEDC was conceived as a
cross-disciplinary electronics and plutonics research center focused on the
development of high-speed electronic components and signal processing in order
to achieve breakthrough performance.  As Director, Dr. Laskar established
numerous partnerships with outstanding technology companies from around the
world.  These companies were encouraged by Dr. Laskar to provide, and did
provide, monies to GEDC and various affiliated Georgia Tech organizations which
sought the opportunity to work closely on advance research in collaboration with
faculty members at Georgia Tech.  This opportunity was one companies were

keenly interested in pursuing because, largely as a result of Dr. Laskar's path-finding

research, Georgia Tech had become the place to be in mixed signal technology research.  More than $70 Million in managed grants and research contracts were secured by Dr. Laskar in his capacity either as Principal Investigator or Co-Investigator on specific research projects.  As measured by grants and research contracts received, Dr. Laskar was one of the most productive faculty members in the entire Institute.  Dr. Laskar attracted grants and research contracts for:

(a) National and International companies including:

    i.    Hewlett-Packard;

    ii.    Texas Instruments;

    iii.    General Electric;

    iv.    National Semiconductor Corporation;

    v.    Samsung;

    vi.    BellSouth

    vii.    International Business Machines (IBM);

    viii.    Northrop Grumman; and

    ix.    Microsoft Corporation.

(b) Governmental organizations such as:

    i.    NASA;

ii. The U.S. Army;

iii. The U.S. Navy; and

iv. The National Science Foundation.

6.

In furtherance of Georgia Tech's mission to provide a learning laboratory for its students, the GEDC during Dr. Laskar's tenure saw ever-increasing numbers of undergraduate and graduate level students working on Center research programs. Attracted by the exciting work of Dr. Laskar and his colleagues, these students were assigned to Georgia Tech faculty members actually conducting the research. Benefited by Dr. Laskar's outreach and charismatic leadership, a large portion of that research was supported by some of the world's most important and best-known technology companies, giving the Center additional cache and leverage in attracting the very best doctoral candidates to enroll at Georgia Tech. Once enrolled, these students were able to utilize the equipment, facilities and chip technology made available to them at the Center. They were further able to use their research as part of their doctoral theses and to have the opportunity to make important contributions to an emerging new technology. Today, GEDC has more than 15 active faculty and over 100 graduate and undergraduate students engaged in its activities. Georgia Tech advertises GEDC as being "one of the world's largest university-based semiconductor research centers." (www.gedc.gatech.edu)

7.

The investigation undertaken by Defendants, the suspension without pay, and the termination of Dr. Laskar's tenured faculty position, followed by his arrest and the ensuing criminal prosecution, severely damaged Dr. Laskar. These actions were amplified by the media coverage which Defendants organized and assisted. As a direct consequence, Dr. Laskar's reputation within the academy was destroyed. He was not able for a period of six (6) years following his arrest to secure full-time employment at any other accredited academic institution. The resulting damages to the Professor's personal health and well-being were profound. Dr. Laskar was professionally diagnosed as suffering from post-traumatic stress syndrome ("PTSD"). His wife and three children suffered severe and long-lasting emotional distress and anxiety. The entire Laskar family was devastated by a disgrace that was needlessly, publicly, and maliciously inflicted upon them.

8.

Specific actions undertaken by Defendants demonstrate the maliciousness with which their investigation was pursued. Defendants deliberately timed the release of their investigative findings without even granting Dr. Laskar a single meeting to know and understand, then challenge the purported findings which had been made. Defendants deliberately orchestrated their Georgia Bureau of Investigation raid of Dr. Laskar's office, vehicles, and residence to occur on May

17, 2010, the very day that a heralded new technology company founded by Dr. Laskar, Sayana Wireless LLC, was scheduled to be sold. Both Dr. Laskar and Georgia Tech's affiliated contracting entity, the Georgia Tech Research Corporation ("GTRC"), held substantial equity interests in Sayana. The scheduled sale of the company would have provided Dr. Laskar millions of dollars in transaction proceeds, and would have provided GTRC millions of dollars more. When Dr. Laskar was suspended, his suspension was implemented without pay, in contravention of the Institute's own Faculty Handbook regulations. When the ensuing revocation process got underway, the Institute again did not follow its own procedures, and Dr. Laskar was never permitted to appear before the interim faculty panel to plead his case.  Defendants even reneged on the conditions which Dr. Laskar's criminal attorney had negotiated for the surrender of the Professor to law enforcement authorities, deceptively moving Dr. Laskar into the public square so that television reporters whom Defendants had arranged to be on hand could film the proverbial "perp" walk as the Professor was taken into custody.

9.

In the weeks and months which followed, further substantial damages were caused to Dr. Laskar. Dr. Laskar's sparkling career, its glowing prospects for further advancement, the Professor's personal reputation, and his professional role as mentor and advisor to an extraordinary number of talented Georgia Tech

9

advanced degree and doctoral students, were all effectively demolished. Dr. Laskar was suspended without pay in violation of Georgia Tech's own policy guaranteeing payment until the merits of the investigation could be heard. He was then deprived of his tenured position on the Georgia Tech faculty. The loss of that faculty position, and the loss of transaction proceeds had the scheduled sale of Sayana Wireless LLC been permitted to occur, both jeopardized Dr. Laskar's ability to support and care for his family. In the absence of the financial support he was rightfully due, Dr. Laskar was forced to make other arrangements to address the substantial medical expenses incurred in treating him and his family members for the emotional and physical illnesses they suffered. Crushing legal expenses also had to be paid in order for Dr. Laskar to defend himself from the unsubstantiated charges being brought against him.

10.

More than six years later, on October 5, 2016, after a bitter and protracted legal process, The Honorable Robert McBurney, a sitting Judge of the Superior Court of Fulton County, Georgia, entered an order dismissing all criminal charges brought and filed against Dr. Laskar.

11.

Termination of the criminal proceedings against Dr. Laskar gives rise under

10

Georgia law to a claim for malicious prosecution. *O.C.G.A. § 51-7-41*.  Dr. Laskar shows that the investigation undertaken by Defendants, and the resulting criminal prosecution filed and pursued against him, was the result of actions orchestrated and coordinated by Defendants with law enforcement and prosecutorial actors. Under the guise of a university inquiry led by the Internal Audit Department of Georgia Tech, Defendants maliciously pursued an investigation of Dr. Laskar unsupported by any probable cause. Defendants' efforts were, in part, a deliberate effort to assign blame to Dr. Laskar for accounting practices and research procedures that were both commonplace and longstanding within the Georgia Tech community.

12.

The actions of the Defendants were not just immoral, they were unjust. They were extravagantly unfair to a man who had done nothing but bring renown and distinction to Georgia Tech and enriched the research grant and foundation coffers of the Institute by millions and millions of dollars.  Maliciously pursued and unsupported by any probable cause, the Defendants' criminal investigation any prosecution of Dr. Laskar was wrongful, illegal and scandalous.  It inflicted one more stain upon the Georgia Tech community at large. Plaintiff brings this action to correct the injustice that was perpetrated against him, to clear his name in every possible espect, and to win the monetary relief that is due him.

## JURISDICTION AND VENUE

### 13.

This Court has subject-matter jurisdiction of this action under and by virtue of *Title 28 U.S.C. §§ 1331 and 1343*.   Plaintiff raises a federal question and the violation of his Constitutional rights. This Court has pendent jurisdiction of Plaintiff's state law claims under and by virtue of *28 U.S.C. §1367(a)*.

### 14.

This Court is the proper venue in which to adjudicate this action under and by virtue of *28 U.S.C. §§ 1391(b)(1) and (2)*.   The material actions and omissions of Defendants took place in this District and Division.

## PARTIES

### 15.

Dr. Laskar was previously a resident of Atlanta and the State of Georgia. Dr. Laskar now resides in Santa Clara County, California. The Defendants, all of whom were acting under color of a state and state law as employees of Georgia Tech and its affiliated entities, provided false and misleading information regarding Dr. Laskar to law enforcement and prosecutors, which led to the criminal prosecution that was terminated in Dr. Laskar's favor. The actions described led to a Fourth Amendment violation of Dr. Laskar's constitutional rights and subjects

the Defendants to Section 1983 liability for malicious prosecution. Plaintiff's claims are asserted against Defendants in their individual and personal capacities.

16.

Defendant Phillip W. Hurd is a resident of the State of Georgia and resides at 1881 Lancaster Drive S.E., Conyers, Rockdale County, Georgia 30013-6440. Defendant Hurd is subject to the jurisdiction of this Court.

17.

Defendant Patrick A. Jenkins is a resident of the State of Georgia and resides at 4704 Brazil Wood Court, Kennesaw, Cobb County, Georgia 30144-1487. Defendant Jenkins is subject to the jurisdiction of this Court.

18.

Defendant Jilda Garton is a citizen and resident of the State of Georgia and resides at 420 Woodvine Court, Roswell, Fulton County, Georgia 30076-3630. Defendant Garton is subject to the jurisdiction of this Court.

19.

Defendant Mark G. Allen was previously a resident of the State of Georgia. He is today a resident of the State of Pennsylvania and resides at 2037 Spruce Street, Philadelphia, Pennsylvania 19103-5623. Defendant committed tortious acts and omissions while in Georgia which caused serious and substantial damage to Plaintiff in Georgia, including acts constituting and supporting the malicious

prosecution of Plaintiff. Under and by virtue of *O.C.G.A. § 9-10-91*, Defendant Allen is subject to the jurisdiction of this Court.

## OPERATIVE FACTS

### Dr. Laskar's Superlative Academic And Professional Credentials

20.

Dr. Laskar is widely known for his work in designing and developing mixed signal integration circuits and chips for use in wireless and digital communications systems. At Georgia Tech, Dr. Laskar spearheaded the development of high performance mixed signal solutions operating in low-power usage scenarios (i.e., in situations involving 100 to 1,000 times lower power outputs than previously accomplished). Dr. Laskar's work produced substantially lower cost structures and made possible the development of technical solutions costing less than $10.00. Prior thereto, design and build expenses had exceeded $10,000.00.

21.

At all times material to the events described in this Complaint, Dr. Laskar's research included:

> (a) the original design and development of the power amplifier (a key component of the transmitter) used in Intel Corporation's Centrion Platform;
>
> (b) the development of high speed equalization chips (i.e., techniques

14

to preserve information in high speed data links) used by Intersil

Americas LLC for improved data connectivity in servers being

deployed by Google, Microsoft Corporation and Cisco Systems;

and

(c) the development of technology building blocks for the

miniaturization of military grade radar systems affixed to chips.

22.

Dr. Laskar began his technical career by earning a Bachelor of Science

degree in Computer Engineering from Clemson University in 1985.

23.

In 1989, Dr. Laskar earned a Master of Science degree in Electrical

Engineering from the University of Illinois at Urbana-Champaign.  Two years

later, in 1991, he earned his Doctorate degree in Electrical Engineering from that

same institution.

24.

Thereafter, Dr. Laskar began work as a Research Engineer at the

International Business Machines Corporation ("IBM").  Working out of IBM's

Thomas J. Watson Research Center in New York, Dr. Laskar focused on

Cryogenic CMOS.  Cyrogenics is a branch of physics dealing with the production

and effects of very low temperatures. CMOS, or complementary metal-oxide-

semiconductors, is a technology used in constructing integrated circuits. The technology is used in microprocessors, microcontrollers, static RAM and other digital logic circuits. Cyrogenic CMOS are currently being evaluated as point-contact HPGe detectors (i.e., hyperpure germanium detectors) in connection with deep space dark matter search and neutrino experimentation.

25.

In 1992 Dr. Laskar became an Assistant Professor at the University of Hawaii at Manoa.  There, he helped lay the foundation for establishment of the University's Microwave Applications Laboratory.

26.

In January 1995 Dr. Laskar was appointed an Assistant Professor at the Georgia Institute of Technology ("Georgia Tech").  Two years later, he was promoted to the position of Associate Professor with tenure.

27.

In 2002, Dr. Laskar became a tenured full Professor at Georgia Tech. At the time of his appointment, Dr. Laskar was simultaneously named the Joseph M. Pettit Professor of Electronics.

28.

In 2003 Dr. Laskar helped to found Georgia Tech's Georgia Electronic Design Center (the "GEDC").  He became the GEDC's first Director. As

previously noted, GEDC is a cross-disciplinary electronics and photonics research center focused on the development of high-speed electronic components and signal processing.  Dr. Laskar worked to establish partnerships between GEDC and prominent technology companies from around the world.  These companies provided monies to GEDC or affiliated Georgia Tech organizations in order to have the opportunity to work closely with Georgia Tech faculty members on advance research. As mentioned, more than $70 Million in managed grants or research contracts were secured by Dr. Laskar in his capacities as Principal Investigator or Co-Principal Investigator.

29.

Dr. Laskar ultimately became one of the most productive faculty members at Georgia Tech as measured by grants and research contracts received. National and international companies including Hewlett-Packard, Texas Instruments, General Electric, National Semiconductor Corporation, Samsung, Bellsouth, IBM, Northrop Grumman, and Microsoft Corporation funded grants and research contracts.  Governmental organizations such as NASA, the U.S. Army, the U.S. Navy and The National Science Foundation did so as well. GEDC provided a learning laboratory for University students engaged in such research and seeking to advance their graduate and doctoral ambitions. Today, the Center has more than 15 active faculty and over 100 graduate and undergraduate students. Georgia Tech

currently advertises the Center as "one of the world's largest university-based semiconductor research centers." (www.gedc.gatech.edu)

30.

In 2007 Dr. Laskar was awarded the Georgia Tech-Schlumberger Chair in Microelectronics at the School of Electrical and Computer Engineering. Schlumberger NV is a world-wide business and provides integrated project management solutions to the international oil and gas exploration and production industries.

31.

Over the course of his academic career, Dr. Laskar has written and presented numerous scholarly papers, for publication and presentation in the United States and around the world.  His work has focused on mixed signal design. As previously mentioned, he is the author of five (5) books and more than 600 peer-reviewed journal and conference articles.

32.

With more than 50 patents issued to him in the field of mixed signal design, Dr. Laskar is an industry leader in 60GHz signal design. His prolific scholarship, leading-edge research and his extensive mentoring of students and colleagues has caused Dr. Laskar to become the recipient of numerous awards and honors. A complete listing of those recognitions can be found in Paragraph 4 above.

33.

Significantly, these recognitions were not in all instances devoted to the accomplishment or advancement of Dr. Laskar's own career aspirations.  At least two awards came to the Professor for being an "outstanding" mentor to Georgia Tech graduate students and a "distinguished" mentor in the School of Electrical and Computer Engineering.  As previously noted, at Georgia Tech Dr. Laskar simultaneously served as Faculty Advisor to no less than 50 graduate doctoral candidates, which by any measure is an impressive number and was at that time more than any other Georgia Tech professor.

### The Formation Of Sayana Wireless, LLC By Dr. Laskar

34.

In 2006, Dr. Laskar created Sayana Wireless, LLC ("Sayana"), a Georgia limited liability company, together with Dr. Stephane Pinel, a colleague and fellow Georgia Tech employee.  Dr. Laskar owned a majority membership interest in the company. GTRC was granted a 5% member interest in Sayana and provided copies of all organizational and stock subscription documents.  These documents detailed the ownership interests held by all members in the company, including the majority member interest held by Dr. Laskar.  GTRC's ownership share was later increased to a 10% member interest.

35.

Georgia Tech actively encouraged Dr. Laskar to found Sayana, just as it encouraged other Institute professors to found companies that could advance the dissemination of their research technology to the public at large. Georgia Tech was engaged in a conscious effort to emulate and even surpass the success of peer institutions like Stanford and MIT in the incubation and spin-off of technology companies.  With Dr. Laskar's leading edge research work in mixed signal technology, Georgia Tech encouraged Dr. Laskar to have Sayana join GEDC as a member company. Georgia Tech also encouraged Sayana to apply to VentureLab as an internal start-up company within GEDC.  Georgia Tech later sponsored a series of televised symposia where, at one such event, Georgia Tech's senior executives and officers were in attendance, and Dr. Laskar was introduced to them and other audience members as a Principal of Sayana.

36.

Building upon Dr. Laskar's proprietary technology, Sayana was also engaged in the development of high-speed wireless signaling technology. Because of Dr. Laskar's position as a university employee, ownership of this intellectual property was vested in Georgia Tech and held in the name of GTRC.

37.

GTRC is a state chartered 501(c)(3) not-for-profit corporation serving Georgia Tech. GTRC serves as the contracting entity for all sponsored research activities at Georgia Tech. Its Board of Directors is comprised of Georgia Tech faculty, the President of Georgia Tech, others appointed by the President, a representative from the Georgia Tech National Alumni Association, a representative from the Georgia Tech Foundation, Inc., and other members from industry at large. GTRC licenses all intellectual property which is created by Georgia Tech employees, including faculty members. The intellectual property licensed by GTRC includes all pertinent patents, copyrights and trade secrets. GTRC supports and promotes research conducted at Georgia Tech through its stewardship of funds which are collected for sponsored research, and through its own financial support of certain research activities. Through technology transfer, GTRC enables Georgia Tech to maintain partnerships with public and private sectors of the economy in order to assure that research benefits are widely disseminated. All funds collected by GTRC are used to support those Georgia Tech programs requested by the University and approved by the GTRC Board of Directors. GTRC pays for sponsored research costs, license and royalty fees, and all corporate operating expenses associated with the work. GTRC supports Georgia Tech's grants and funded support programs. GTRC also assists Georgia

Tech in obtaining quality research space, entering into long-term leases for specialized research equipment, and conducting other research support programs as requested by Georgia Tech.

38.

In February 2009 Sayana delivered $90,000 to GEDC to support its membership in the Center and ongoing GEDC operations.  Earlier, Sayana had paid the salaries of GEDC co-op research assistants during the 2007-2009 academic years and in the approximate total amount of $165,000.  Sayana also paid research expenses of GEDC during academic years 2008-2009 in the approximate amount of $70,000.  Sayana paid to GTRC patent and licensing fees in the approximate amount of $220,000.  In consideration of all these amounts, Sayana made use of Georgia Tech facilities, research equipment and staff.  This use was authorized, and Sayana's usage was no different from that of any other GEDC hosted and affiliated company.  Sayana's usage of the Center's facilities, equipment and staff was actively encouraged by Georgia Tech.

39.

Funds paid by Sayana to GEDC in support of membership and the Center's ongoing operations enabled it to utilize the Center's facilities, equipment and research staff.

40.

In July 2006 Sayana entered into a License Agreement with the GTRC, whereby GTRC licensed to Sayana the signaling technology that Dr. Laskar had developed.  In consideration of this license, Sayana granted to GTRC a 10% member interest in the company.  Sayana then became committed to commercializing its licensed technology and earning compensation for itself and all its members, including GTRC.

41.

As a start-up company working from the Center, Sayana was successful in advancing its licensed technology and positioning itself for sale. The assets of the company were scheduled for private auction on May 17, 2010 pursuant to a transaction managed and conducted by Pagemill Partners of Silicon Valley, California.  It was anticipated that Sayana would receive sales proceeds totaling approximately $30 Million.  It was further understood that GTRC would receive 10% of that expected sum, or $3 Million.

**The Suspension Of Dr. Laskar From Georgia Tech**

42.

This expectation notwithstanding, by letter dated May 17, 2010, Dr. G.P. Peterson, President of Georgia Tech, suddenly announced to Dr. Laskar: "In

reviewing the recent cost overruns within the Georgia Electronic Design Center

(GEDC), the Institute's Department of Internal Audit discovered what they believe

to be substantial evidence of malfeasance on your part including the

misappropriation of Institute resources for the benefit of a company, Sayana

Wireless LLC, of which you are part owner."

43.

President Peterson informed Dr. Laskar that, "effective immediately, I am

suspending you ***without pay*** until the Institute concludes its investigation of this

matter." (emphasis supplied)  At the time of Mr. Peterson's letter to Dr. Laskar, Dr.

Laskar had been an employee of Georgia Tech for more than 15 years.  President

Peterson's suspension of Dr. Laskar without pay was in direct violation of the

Georgia Tech Faculty Handbook provision governing this matter.

44.

Section 5.10.5 of the Georgia Tech Faculty Handbook in effect at the time of

President Peterson's notice to Dr. Laskar (the "Faculty Handbook") provides that

"The President in consultation with the Executive Board shall determine whether a

faculty member confronted with a dismissal charge shall be temporarily relieved of

duties.  Unless legal considerations forbid, any such relief from duties will be *with*

*pay.*" (emphasis supplied)

45.

The final paragraph of Section 5.10.4 of the Faculty Handbook provides that it is only upon the conclusion of a formal hearing and dismissal by the President that "the Faculty member shall be suspended from employment *without pay* from the date of the final decision of the President." (emphasis supplied)

46.

The Georgia Institute of Technology is a research university of the University System of Georgia, but it is not a distinct legal entity from the Board of Regents of the University System of Georgia.  The Board of Regents has vested in itself the government, control and management of the University System of Georgia and each of its institutions. There is no provision in the Board of Regents Policy Manual in effect at the time of President Peterson's notice to Dr. Laskar (the "Regents' Manual") authorizing the suspension of faculty without pay. As does the Faculty Handbook, the Regents Manual authorizes suspension without pay of a faculty member *only* upon termination: "Upon dismissal by the president, the faculty member shall be suspended from employment without pay from the date of the final decision of the president."  President Peterson's suspension of Dr. Laskar without pay therefore violated the Regents Manual.

47.

Section 5.10.4 of the Faculty Handbook provides that during the pendency of dismissal procedures, "[e]xcept for such simple announcements as may be required covering the time of the hearing and similar matters, *public statements and publicity about the case* by either the Faculty member or Administrative Offices *should be avoided until the proceedings have been completed.*" (emphasis supplied)  Section 8.3.9.2 of the Regents Manual also provides that "[e]xcept for such simple announcements as may be required covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member or administrative officers should be avoided until the proceedings have been completed."

48.

Representatives of Georgia Tech, including the Defendants, discussed and coordinated at length the dissemination of information to members of the news media regarding the suspension of Dr. Laskar.  These coordinated actions included:

(1) on the day that President Peterson suspended Dr. Laskar without pay – May 17, 2010 - Georgia Tech issued a press release and an invitation to the press regarding the GBI's execution of 23 differing search warrants against Dr. Laskar's personal papers and property and against other named individuals and property;

(2) Dr. Gary May of Georgia Tech sent emails to the faculty, staff and students of the School of Electrical and Computer Engineering dated May 17, 2010 and June 22, 2010;

(3) Georgia Tech posted a link on the website of the Georgia Electronic Design Center to a WSB-TV report on the suspension of Dr. Laskar; and

(4) Georgia Tech improperly discussed with reporter Richard Belcher and WSB-TV purported facts relating to the suspension of Dr. Laskar and the initiation of termination proceedings against him, all in violation of Section 5.10.4 of the Faculty Handbook.

49.

There is no provision in the Faculty Handbook or the Regents Manual authorizing the termination of a tenured faculty member's access to email and voicemail communications systems prior to the termination of the employment of that tenured faculty member. Despite this lack of authorization, these aforementioned steps were taken against Dr. Laskar.

50.

There is no provision in the Faculty Handbook or the Regents Manual authorizing the omission or nondisclosure of the affiliation of a tenured faculty member in connection with published scholarly papers or conferences after dismissal proceedings have been initiated against that tenured faculty member but

27

before a ruling has been made in such a proceeding. Despite this lack of authorization, these aforementioned steps were taken against Dr. Laskar.

51.

There is no provision in the Faculty Handbook or the Regents Manual authorizing the removal of a tenured faculty member as the named and published advisor of a Ph.D. candidate after dismissal proceedings have been initiated against the tenured faculty member but before a ruling has been made in such a proceeding. Despite this lack of authorization, these aforementioned steps were taken against Dr. Laskar.

52.

Each year during the course of his employment at Georgia Tech, Dr. Laskar entered into a Fiscal Year Employment Contract with the Board of Regents. Each of these Fiscal Year Employment Contracts consisted of a form agreement setting forth the terms of Dr. Laskar's employment.

53.

Among the terms of the 2009 Employment Contract executed by Dr. Laskar appeared the following language: "This agreement is made expressly subject to applicable state and federal laws and to the statutes and regulations of this institution and to the Bylaws and Policies of the Board of Regents, which are available for your inspection upon request." The applicable policies and procedures

28

of the Board of Regents were set forth in the Board of Regents Policy Manual,

available at http://www.usg.edu/policymanual/.  The applicable policies and

procedures of Georgia Tech were set forth in its Faculty Handbook, available at

http://www.academic.gatech.edu/handbook/Georgia_Institute_of_Technology_Fac

Faculty_Handbook_Sep2008.pdf.  Despite the fact that Dr. Laskar's Employment

Contract was made expressly subject to the policies and procedures of the Board of

Regents, Defendants acted in flagrant violation of them.


**The Substantive Claims Involving Dr. Laskar Assembled And Recorded By**
**Defendant Hurd**

54.

In December 2009, Defendant Jilda D. Garton, the Vice President for

Research at the Georgia Institute of Technology and the General Manager of

Georgia Tech Research Corporation (GTRC) and Defendant Mark G. Allen, the

then Senior Vice Provost for Research and Innovation at Georgia Tech, requested

that Defendant Phillip W. Hurd, the Chief Audit Executive at Georgia Tech's

Department of Internal Auditing, investigate cost overruns they reported had

totaled approximately $650,000 and were related to a contract called "National

Semiconductor."  Defendant Hurd initially reported that he "thought this was just a

major, colossal accounting screwup."

55.

After attending several meetings with Georgia Tech employees and
Defendant Garton, Defendant Hurd determined that he would conduct an audit of
all GEDC finances. Defendant Hurd later discussed the progress of his work with
Defendant Allen, with Dr. Gary Schuster, who was then serving as Provost for
Georgia Tech, with Dr. G.P. "Bud" Peterson, the President of Georgia Tech, and
with Patrick McKenna, Esq., the Chief of Legal Affairs for the Institute.

56.

Defendant Hurd subsequently produced an Official Report of Suspected
Malfeasance (the "2010 Report") dated April 14, 2010.  He delivered that report to
John M. Fuchko, III, the then Associate Vice Chancellor for Internal Audit at the
Board of Regents of the University System of Georgia.

57.

In the 2010 Report, Defendant Hurd declared that Dr. Laskar had, among
other things, made misrepresentations to the IRS, had misused equipment, offices
and laboratory facilities of Georgia Tech in order to further the interests of Sayana,
had violated several Georgia Tech policies and procedures, and had committed
violations of statutory law, which Defendant Hurd identified as *O.C.G.A. § 40-10-
23, O.C.G.A. § 40-10-25, and United States Code Title 18, Part I, Chapter 46, §*

*1001.*  The Official Code of Georgia Annotated does not contain either of the two

Georgia provisions which were cited by Defendant Hurd.

58.

Defendant Hurd concluded his 2010 Report by requesting that, if a GBI

agent were to be assigned to investigate the case, that agent should be Mr. Wesley

Horne.

59.

Vice Chancellor Fuchko notified Senior Assistant Attorney General David

S. McLaughlin of the State of Georgia Attorney General's Office of Defendant

Hurd's reported findings and charges against Dr. Laskar.

60.

The following week, Mr. McLaughlin met for several hours with

representatives of Georgia Tech and the Office of Internal Audit for the Board of

Regents to discuss the issues raised in Defendant Hurd's 2010 Report. While

Defendant Hurd considered his presentation to be a "preliminary audit report," but

he never wrote and signed a final one. He proceeded to present a PowerPoint

summary of his findings and conclusions

61.

Following the meeting, Mr. McLaughlin announced, "It is clear that crimes

have been committed that warrant immediate criminal investigation . . . *Chief*

***Audit Executive Phillip W. Hurd and his team have developed evidence showing***

***that there is probable cause to believe that crimes have been committed.***"

(emphasis supplied)

62.

By letter to the Director of the GBI dated April 21, 2010, Mr. McLaughlin

requested that the GBI pursue a criminal investigation of Georgia Tech's reported

allegations against Dr. Laskar and Georgia Tech employee, Dr. Stephane Pinel.

Mr. McLaughlin attached to his letter a copy of Defendant Hurd's 2010 Report.

Mr. McLaughlin noted that he does not generally request a particular special agent

be assigned to a given case, but in this instance he requested that Wesley Horne be

appointed - the same special agent requested by Mr. Hurd.

63.

In his letter, Mr. McLaughlin also emphasized that "Georgia Tech President

G.P. Peterson has pledged the full support of the university and the resources of

Georgia Tech Internal Auditing . . . Mr. Hurd and his team stand prepared per Dr.

Peterson's directive to assist the GBI and Attorney General's Office in any way

needed."

64.

The GBI thereafter proceeded to investigat Dr. Laskar and Dr. Stephane

Pinel.

65.

On the morning of May 14, 2010, and approximately one month after Defendant Hurd had submitted the 2010 report, both he and GBI Special Agent Lisa Vorrasi met with Cobb County Superior Court Judge Adele Grubbs. Defendant Hurd and Agent Vorrasi sought issuance of an Order For Search And Seizure of Dr. Laskar's home and two of his automobiles.

66.

Defendant Hurd and Agent Vorrasi asked the Court to issue an Order directing that any computers seized during the searches did not have to be taken to the GBI computer forensics lab in DeKalb County, Georgia, but could instead be taken to the office of Georgia Tech Internal Auditing. Defendant Hurd and Agent Vorrasi asked the Court to issue an Order allowing non-law enforcement employees of Georgia Tech to accompany the GBI and to be present upon execution of the search warrants.

67.

Agent Vorrasi submitted an Affidavit In Support Of Search And Seizure Warrants. Upon consideration of Agent Vorrasi's Affidavit and other evidence submitted under oath, Judge Grubbs adjudged there to be probable cause to believe that Dr. Laskar had violated State laws. The requested Orders For Search And Seizure were issued.

68.

Later that same morning, Defendant Hurd and Agent Vorrasi met with
Fulton County Superior Court Judge Craig Schwall to seek an Order For Search
And Seizure of:

- Dr. Stephane Pinel's home;

- nine automobiles belonging either to Dr. Laskar, Dr. Pinel or Sayana
  employees;

- Dr. Laskar's office at Georgia Tech;

- Dr. Pinel's office at Georgia Tech;

- the offices of three other Georgia Tech employees;

- the office of a Sayana employee;

- Sayana's office space at 75 Fifth Street, NW, Suite 310, Atlanta, Georgia;

- three (3) lab locations at Georgia Tech;

- the person of Dr. Pinel; and

- the person of Dr. Laskar.

69.

Defendant Hurd and Agent Vorrasi asked the Court to provide that any
computers seized during the searches would not have to be taken to the GBI
computer forensics lab in DeKalb County, Georgia but could instead be taken to
the offices of Georgia Tech Internal Auditing.

70.

Defendant Hurd and Agent Vorrasi asked the Court to issue an Order permitting non-law enforcement employees of Georgia Tech to accompany the GBI and to be present upon execution of the search warrants.

71.

Agent Vorrasi submitted an Affidavit In Support Of Search And Seizure Warrants. Upon consideration of Agent Vorrasi's Affidavit and other evidence submitted under oath, the Honorable Judge Schwall adjudged there to be probable cause to believe that Dr. Laskar had violated State laws. The requested Orders For Search And Seizure were issued.

72.

Agent Vorrasi's Affidavit was 21 pages in length, exclusive of exhibits. In her Affidavit, the Agent stated that Dr. Laskar had used his position at Georgia Tech to steal money and other resources from the Institute, including equipment, lab space, employees, specialized licensed software, computers and computer servers. ***In the section of her Affidavit entitled "Sources of Information," Agent Vorrasi wrote that "Georgia Tech Director of Internal Auditing Philip [sic] W. Hurd is affiant's primary source of information for this affidavit . . . He and his audit team are responsible for conducting the investigative audit which led to discovering the crimes alleged in this affidavit. He and his audit team have***

*reviewed thousands of emails and records. The facts presented herein are*
*gleaned from this review. Additional facts contained herein are known*
*personally by Mr. Hurd . . . [and through his] review of [certain records] . . . and*
*interviews with [certain Georgia Tech staff] . . . Unless otherwise indicated, all*
*facts presented herein are derived from my conversations and communications*
*with Mr. Hurd*." (emphasis supplied)

73.

Agent Vorrasi's Affidavit referenced what Defendant Hurd and his Georgia
Tech Audits team "examined," "retrieved," "imaged," "identified," "found,"
"discovered," "revealed" and "determined."  Four times she used either the phrase
"Based upon my conversations with Mr. Hurd," or "According to Mr. Hurd." The
Agent additionally employs the phrase "According to Audits" on four occasions
and utilizes the phrase "According to Georgia Tech" at 24 separate places in the
Affidavit.

## Misrepresentations That Sayana Used Office Space Without Payment

74.

Mr. Hurd reported to Agent Vorrasi that Sayana had wrongfully occupied
and used office space in Georgia Tech's Technology Square Research Building

("TSRB"), explaining that Sayana should have paid Georgia Tech to lease the space.

75.

Defendant Patrick A. Jenkins testified under oath and before a representative of the Attorney General's office that no evidence had been found demonstrating the existence of a lease for office space by and between Georgia Tech and Sayana.

76.

Defendant Hurd admitted under oath that he had not found a single invoice, bill or contract to show that GEDC members generally were paying for office space, for their use of computers, or for their use of CAD labs or anything else.

77.

**Defendant Jenkins subsequently admitted under oath that he was not aware of any evidence demonstrating that GEDC company members whose names appeared on a map of the TSRB, including G-Tronix, Tepyl, Terabit, Quellan, Agilent, Microsoft, Neuromorphix, Whiper, Sienna or OFS had any lease or contract obligation to pay for use of office space at the Technology Square Research Building ("TSRB"). Defendant Jenkins testified that he "was not directed to look into those [companies] . . . I was only directed to look at Sayana."** (emphasis supplied)

78.

Dr. Paul Hasler, a Professor in the School of Electrical and Computer Engineering and the founder of two start-ups that had become GEDC member companies, gave a sworn statement specifying that some of the benefits of GEDC membership included access to and the use of space within TSRB when available.

79.

Dr. Gary May testified under oath and before a representative of the Attorney General's office that the benefits of GEDC membership included the ability to use GEDC equipment and facilities. He testified that TSRB does not charge rent and that, if a company had an office space in TSRB, that company by definition did not pay rent.

80.

Dr. May testified under oath that the companies Pirelli, Microsoft, Quellan, G-Tronix, Agilent and Neuromorphix all had office spaces in TSRB, and none of them was charged for their space.  He explained that there was no charge for using TSRB space.

81.

In contrast, Defendant Jilda D. Garton testified under oath and before a representative of the Attorney General's office that, while GEDC bylaws provided that GEDC member companies had "[a]ccess to GEDC resources, personnel and

activities," the phrase "access to resources" meant only that GEDC members could observe things being used and observe students at work, and could suggest problems for students to work on, and could engage in discussions about research results. Defendant Garton testified that such access did *not* mean that GEDC members could actually use GEDC resources or personnel. She further testified that use could occur only after the Center had established a cost center so that Georgia Tech was paid for the use of its equipment and facilities.

82.

Defendant Mark G. Allen testified under oath and before a representative of the Attorney General's office that a GEDC member company was able to use laboratory tools, CAD tools, laboratory equipment, or computers, only after a sponsored research agreement was entered into or a cost center was established, by which the member company would be billed. However, Defendant Allen was subsequently forced to concede that he was not aware of this being done with any GEDC member company.

83.

Defendant Garton testified under oath and before a representative of the Attorney General's office that she was not personally aware of other centers or individual professors who were, like Dr. Laskar, using GEDC resources to manufacture chips. She testified that she was not personally aware of any person

using chips designed with Georgia Tech equipment and for use by start-up companies.

84.

Defendant Garton's lack of knowledge notwithstanding, Defendant Allen co-founded a company called Axion Biosystems while he was working at Georgia Tech.  Axion Biosystems used Georgia Tech equipment to design its chips and made use of Georgia Research Alliance ("GRA") funds to produce its chip prototypes. The GRA is an independent not-for-profit organization operating in conjunction with the state of Georgia's Department of Economic Development and has as its objective the expansion of research and commercialization capacity within Georgia's universities in developing the state's technology economy.

85.

Defendant Allen testified under oath and before a representative of the Attorney General's office that it was appropriate to use GRA Phase 1 and Phase 2 funds to advance prototypes in order to make them available for commercialization.

86.

Georgia Tech Auditor Larry Webster wrote in a document he entitled "Lessons Learned," under the section heading "Institute Center Policy," that "OSP [Office of Sponsored Programs] and GT [Georgia Tech] have a Center policy,

which has rules and procedures for establishing and running a GT Center. GEDC was 'grandfathered-out' of these rules, because they existed before the rules were finalized (about November 2006). For GEDC, this led to educational memberships being promoted (unrestricted gifts to GTF [Georgia Tech Foundation]) and an Advisory Board that did not work as intended to guide & monitor GEDC activity." Mr. Webster suggested that "The President's Office should review all Institute Centers, and specifically approve any other Centers that are allowed not to follow Institute policy." Under the section heading "Gifts from Sponsors," Mr. Webster again noted that "GEDC was grandfathered out" of "the Institute's Center Policies."

87.

In their Responses to Dr. Laskar's First Requests To Admit, dated February 18, 2011, the Board of Regents of the University System of Georgia admitted that they did not possess any agreements, contracts, or other instruments pursuant to which they leased space, equipment, or resources from GEDC or any other division or center of Georgia Tech to any of the following 45 companies:

        (1) Adtran, Inc.;

        (2) ADVA Optical Networking;

        (3) Agilent Technologies;

        (4) Anadigics, Inc.

(5) Analog Devices, Inc.

(6) Ardext Technologies;

(7) Anritsu Corporation

(8) Asahi Glass Co., Ltd.;

(9) BarcoView, LLC;

(10)   Broadcom Corporation;

(11)   CIENA Corporation;

(12)   Echostar Communications Corporation;

(13)   Ecna International;

(14)   EG Technology, Inc.;

(15)   Engent, Inc.;

(16)   Freescale Semiconductor, Inc.

(17)   Hewlett Packard Development Corporation, L.P.;

(18)   HP Labs;

(19)   Infinera;

(20)   Integrated Device Technology;

(21)   Intel;

(22)   IVivity, Inc.;

(23)   Kipper Technologies, Inc.;

(24)   Lancope;

(25)   LumoFlex;

(26)   Manheim;

(27)   Nanoventions;

(28)   National Semiconductor;

(29)   Neuromorphix;

(30)   Nexidia;

(31)   Nortel Networks;

(32)   On Semiconductor;

(33)   Optical Fiber Solutions;

(34)   Quellan, Inc.;

(35)   Raytheon Company;

(36)   Rhode & Schwartz;

(37)   RF Micro Devices, Inc.;

(38)   Schlumberger, Ltd.;

(39)   Siemens;

(40)   SoC Solutions;

(41)   Sun Microsystems, Inc.;

(42)   Texas Instruments;

(43)   VeriSign Communications Services;

(44)   Vocalocity, Inc.;

(45)   Zoobeat.

## Misrepresentations Made Regarding Sayana's Purported Use Of Equipment

88.

Dr. May testified under oath and before a representative of the Attorney General's office that GEDC membership entitled member companies to use GEDC laboratory equipment, design tools and software, and to use its facilities and programs to design chips.

89.

Defendant Patrick A. Jenkins testified under oath and before a representative of the Attorney General's office that Sayana employees had used Cadence software belonging to Georgia Tech and that such use was wrongful.  But Defendant Jenkins acknowledged that his basis for concluding this was based only on the fact he had found no written agreement between Sayana and Georgia Tech that would allow Sayana to use the software.

90.

Defendant Hurd communicated to Agent Vorrasi that Sayana had used a 60GHz channel measurement device owned by Georgia Tech, explaining that the device was the only one of its kind in "this part of the country."  Defendant Hurd

reported to Agent Vorrasi that Sayana had not paid but should have paid monies to Georgia Tech for purported "leased time" when using the device.

91.

The device to which Defendant Hurd referred is a Vector Network Analyzer ("VNA"), and GEDC had approximately five (5) VNAs within its inventory. All of the equipment was purchased using research funding that Dr. Laskar had secured for Georgia Tech. All GEDC member companies, including Sayana, were allowed to use the VNAs at no additional cost and without written agreements in place to use them.

92.

All GEDC member companies also had electronic access to Georgia Tech's Cadence software.

93.

Defendant Jenkins testified under oath and before a representative of the Attorney General's office that he had no evidence in hand to show that GEDC member companies whose names appeared on a map of TSRB, including G-Tronix, Tepyl, Terabit, Quellan, Agilent, Microsoft, Neuromorphix, Whiper, Sienna or OFS, had contracts in place or were being billed at a cost center for their use of space, computers, CAD machines, or laboratory equipment. Defendant Jenkins explained this omission in his proof by testifying he "was only directed to

look at Sayana." He also testified that he had no evidence to show that any GEDC

member company had a cost center established so that they could access Georgia

Tech computers, CAD equipment, laboratory equipment or office space, and,

importantly, **that he "was not asked to look at it."** (emphasis supplied)

95.

Dr. May testified under oath that the companies Pirelli, Microsoft, Quellan,

G-Tronix, Agilent and Neuromorphix, as GEDC member companies, all had the

right to use laboratory equipment and CAD design tools *at no charge* because as a

GEDC member company this right of use was a recognized part of their benefits.

96.

**Defendant Jenkins admitted under oath that he had not pulled up logs**

**for other GEDC member companies having electronic access to Cadence**

**software, that he "only looked at the log for the [sic] Sayana" and that he**

**"was directed to look at Sayana . . . . I was not directed to look at other**

**GEDC members. I was directed to look at Sayana . . . . I was instructed to**

**identify Sayana users."  Defendant Jenkins testified that he did not look at**

**GEDC policy or practice with respect to the use of Cadence software because**

**he was not directed to do so.** (emphasis supplied)

97.

In addition to this significant acknowledgment, Defendant Jenkins also admitted under oath having recalled "something about" a company called Agilent having a CAD lab at GEDC as well as access to CAD tools. Defendant Jenkins acknowledged under oath that he had no evidence that Agilent was billed for such usage or such access, or had a lease or other contract with Georgia Tech regarding its access to the CAD lab or its use of Cadence or other CAD tools. Defendant Jenkins also admitted that Agilent had purchased a CAD tool for the GEDC that was made available for use by other GEDC member companies.

98.

Professor Hasler wrote in a sworn statement that "some of the benefits of GEDC membership included the right to use Georgia Tech computers on a dual-use basis, access and use to laboratory equipment, space and equipment, access and use of CAD and other design tools . . . ." Dr. Hasler went on to report that "Georgia Tech faculty are allowed and encouraged to utilize laboratory resources to develop technology in their lab and/or research group to where it could be commercially transitioned, either through licensing or start-up activities." Continuing, the Professor noted that "many of my colleagues . . . have utilized Institute resources for developing technology to a level for commercial transition

attempt. It is my understanding that this is standard practice or procedure at Georgia Tech."

**Misrepresentations Made About Dr. Laskar Having Stolen Computers**

99.

Defendant Hurd communicated to Agent Vorrasi that Dr. Laskar had stolen computers from Georgia Tech by giving them to Sayana employees.

100.

Defendant Hurd later testified under oath and before a representative of the Attorney General's office that Dr. Laskar had not authorized the use by GEDC member start-up companies, including Axion, Technon and GTronix, of GEDC provided computers. But Defendant Hurd later acknowledged under oath that he had not investigated whether Axion, GTronix or GEDC member companies had purchased their own computers or utilized ones provided by GEDC.

101.

Defendant Hurd also acknowledged under oath that he had not investigated whether Microsoft, Cyber Semi, Samsung, Panasonic, Sony, AT&T or Nokia were permitted to use GEDC computers.

102.

When questioned under oath by Mr. McLaughlin during a court hearing conducted on February 8, 2016 in the criminal case brought against Dr. Laskar,

Chris Evans, the former Director of Operations for the GEDC, testified that the computer which Sayana employees took to the Centergy Building were computers that had been donated by Agilent for use by start-up companies.

## Misrepresentations Made Regarding The Nature Of The Materials Which Sayana Had Transported to ETRI

103.

Defendant Hurd reported to Agent Vorrasi that Sayana had contracted with several companies to develop and deliver functional chip schematics, chips and chip test results.

104.

Sayana in fact had contracted with Electronics and Telecommunications Research Institute ("ETRI") by means of a Collaborative Research Agreement, and pursuant to which Sayana would send chip prototypes to ETRI for further testing and evaluation.

105.

Defendant Hurd reported to Agent Vorrasi that Sayana had entered into several contracts for chips representing fully finished, functional products. Defendant Hurd reported falsely to Agent Vorrassi. The chips which Sayana contracted to deliver, and in fact delivered to ETRI, were chip ***prototypes***.

106.

Almost one year later, Defendant Hurd was forced to acknowledge under oath and before a representative of the Attorney General's office that he had examined Sayana's VentureLab application and had learned that part of Sayana's proposed VentureLab funding was to provide chip prototypes to customers. Defendant Hurd testified that Sayana's application specified that funding for Phase 1 and Phase 2 would go toward chip prototypes and the testing of chips. Defendant Hurd testified that "There's nothing wrong with GEDC making prototype chips," and he further admitted that he knew the chips that were provided by Sayana to ETRI were prototype chips and test chips delivered so that ETRI could evaluate whether the chip technology properly worked and that he chips being so used could not be resold.

107.

In their Responses to Dr. Laskar's First Requests To Admit, dated February 18, 2011, the Board of Regents of the University System of Georgia (of which Georgia Tech is an organizational unit) admitted that the chips fabricated by CMP in Tapeout reference number GT_Oct2008 were prototype chips with no commercial resale value.

108.

In a letter dated May 30, 2009, from Mr. Wooyong Lee, the head of ETRI's engineering staff, to Dr. Laskar, Mr. Lee stated in part: "Pursuant to the [August 1, 2006] and [January 19, 2007] Collaborative Research Agreements . . . ETRI acknowledges that it has received from Sayana the TEST UNIT SAMPLES." (both phrases inside brackets and emphasis in the original).

109.

In a sworn statement read into the record at Dr. Laskar's faculty hearing on March 30, 2012, Mr. Wooyong Lee testified that "[t]purpose of the Collaborative Research Agreements [between ETRI and Sayana] was to engage in cooperative research to better understand the applications for exchange and exchange access services of various technologies, including low cost 60 gigahertz integrated receiver technology . . . Sayana provided ETRI with periodic research reports regarding its research . . . and with samples of chips manufactured by Circuits Multi-Projets . . . so that ETRI could test the chips and verify the workability of the concept.  ETRI paid Sayana for the periodic research reports.  ETRI did not pay Sayana for any of the CMP chip samples Sayana provided.  All of the chips Sayana provided to ETRI were prototype chips with no commercial or no resale value.  None of the chips Sayana provided to ETRI were sold to ETRI for commercial use or resale."

110.

In this regard, Mr. McLaughlin of the Attorney General's Office relied upon Defendant Allen to help him understand the technology at issue in the case and whether it was a fully developed, useable, marketable chip. For example, by e-mail sent in October 2011, Mr. McLaughlin specifically asked for "the technology/patent/license experts," among whom he included by name "Mark Allen and Kevin Wozniak, collectively, perhaps – to take a look at" four types of evidence to test "our theory" that "the CMP-chips and all of the development and testing on the chips was a preordained journey from license agreement to the useable, marketable, wireless technology chip which ended up in those test kits."

111.

Defendant Allen's assistance notwithstanding, Defendant Hurd reported to Agent Vorrasi that Dr. Laskar had stolen money from Georgia Tech through deceptive practices that were intended to cause Georgia Tech to pay a French chip manufacturer, Circuits Multi-Projets ("CMP") for chips used and sold by Sayana in an amount that "may be as great as $700,000 to $1,470,000."

112.

Yet, almost one year later, Defendant Hurd was forced to acknowledge under oath and before a representative of the Attorney General's office that he had

no evidence that Dr. Laskar had taken or used any of the CMP chips for which Georgia Tech had reportedly paid $1.4 million.

113.

As previously noted, Mr. Wooyong Lee, an employee of ETRI, submitted a sworn statement demonstrating that ETRI had paid Sayana for periodic research reports and had not paid Sayana for any of the CMP chip samples which Sayana had provided to it. Mr. Lee reported that all of the chips which Sayana had provided to ETRI were prototype chips with no commercial retail or sale value. None of the chips which Sayana provided to ETRI, he stated, were sold to ETRI for commercial use or resale.

114.

Professor Hasler, previously identified as a Professor in the School of Electrical and Computer Engineering and the founder of two start-up companies which became GEDC member companies, stated in a sworn statement that it was "common practice" at Georgia Tech "for start-up companies to provide research prototypes to customers for evaluation and testing, including prototype integrated chips, often at no additional cost to the start-up company so long as the chips cannot be resold for commercial use."

**Misrepresentations That Work Performed On CMP Chips**

**Was Not For The Benefit Of Georgia Tech**

115.

Defendant Hurd reported to Agent Vorrasi that a variety of documents and things, including research logs and papers, files, notes, journals, data runs, schematics, reports, summaries, Gerber files, and the testing of chips would all show that the work performed on the CMP chips was for Sayana and not for Georgia Tech.

116.

And yet, almost one year later, Defendant Hurd acknowledged under oath and before a representative of the Attorney General's office that he had not bothered to find out whether any of the CMP chips paid for by Georgia Tech were used in connection with research dissertations being written by Georgia Tech students. He explained that he had not done so because, "[i]t wasn't relevant to my investigation." Significantly, Defendant Hurd admitted that Georgia Tech should pay for chips used in connection with student research dissertations.

117.

Defendant Jenkins had e-mailed Mr. McLaughlin in the Attorney General's office on May 19, 2010 to report that "the OCT008 [sic] chip run was part of Sayana's business with ETRI."

118.

Defendant Jenkins importantly omitted from that report the fact that the chip run referenced as GT_Oct2008 was used for research upon which researchers affiliated with Georgia Tech based scholarly papers and presentations.

119.

Matthew Leung, a researcher affiliated with Georgia Tech's School of Electrical and Computer Engineering, stated by sworn affidavit that he co-authored the presentation "Millimeter-Wave CMOS Power Amplifier Technology," for the GEDC/GTAC Industry Review and co-authored the scholarly article "On the Development of CMOS mmW and sub-THz Phased Array Technology for Communication/Sensing Nodes," based on research obtained from several CMP chip runs including CMP chip run GT_Oct2008.

120.

David Yeh, a researcher affiliated with Georgia Tech's School of Electrical and Computer Engineering, stated by sworn affidavit that he co-authored an invited paper and corresponding presentation materials for the Custom Integrated Circuits Conference entitled "60 GHz CMOS/PCB Co-Design and Phased Array Technology," co-authored the three presentations entitled (1) "WE4D-2: High-speed Signal Processing Circuits for Wireless and Optical Communication Systems," (2) "Ultra Low Power Continuous Time Analog and Mixed-Signal

Multi-Gigabit Technologies," (3) "Ultra Low-Power Mixed Signal Multi-Gigabit

Technologies," and co-authored the three scholarly articles (1) "Low-Power

Analog-to-Digital Converter for Multi Gigabit Wireless Receiver in 90 nm

CMOS," (2) "40pJ/bit90nm CMOS Broadband Demodulator with Fully Integrated

DSP Modem," and (3) "On the Development of CMOS mmW and sub-THz

Phased Array Technology for Communication/Sensing Nodes," based on research

obtained from several CMP chip runs including CMP chip run GT_Oct2008.

121.

Defendant Jenkins e-mailed Mr. McLaughlin on May 21, 2010 to inform

him that "Chip run S09C7-1 (aka GT_JAN2007) – that Georgia Tech paid $177K

for was for Sayana's deliverable to ETRI."

122.

Defendant Jenkins omitted from that report the fact that the chip run

referenced as GT_Jan2007 was used for research upon which researchers affiliated

with Georgia Tech based scholarly papers and presentations.

123.

Chang-Ho Lee, a researcher affiliated with Georgia Tech's School of

Electrical and Computer Engineering, stated by sworn affidavit that he co-authored

the presentation "Circuit and Module Challenges for 60GHz Gb/s Radio," based on

research obtained from several CMP chip runs including CMP chip run GT_Jan2007.

124.

David Yeh a researcher affiliated with Georgia Tech's School of Electrical and Computer Engineering, stated by sworn affidavit that he co-authored the five presentations entitled (1) "Circuit Module Challenges for 60 GHz Gb/s Radio," (2) "CMOS mmW Radar Technology," (3) "ISSCC 2008 Session 6/UWB Potpourri/6.8 A 90 nm CMOS 60 GHz Radio," (4) "60 GHz 90nm CMOS Front-end Technology," and (5) "ISSCC: 60 GHz CMOS 90 nm Radio with integrated signal processor," and co-authored the six scholarly articles entitled (1) "A SOC/SOP Co-design approach for mmW SMOS in QFN Technology," (2) "60GHz CMOS: the intersection of gaming and connectivity," (3) "17-dB-Gain CMOS Power Amplifier at 60 GHz," (4) "60GHz CMOS 90 nm Radio with Integrated Signal Processor," (5) "60 GHz Single-Chip 90 nm CMOS Radio with Integrated Single Processor," and (6) "Development of CMOS Based Circuits for 60 GHz WPAN applications," and co-authored an invited paper and corresponding presentation materials for the Custom Integrated Circuits Conference entitled "60 GHz CMOS/PCB Co-Design and Phased Array Technology," based on research obtained from several CMP chip runs including CMP chip run GT_Jan2007.

125.

By e-mail dated November 15, 2010, Defendant Jenkins wrote to Mr.

McLaughlin: "the CMP stuff will show that [Sayana Co-founder Stephane Pinel is]

ordering the items on behalf of GT [Georgia Tech]—which is very damning,

because the Sayana reports to ETRI, along with the contracts, show the true

purpose of the chip orders . . . they cannot deny the deliverables, reports and

contracts between Sayana and ETRI, which in my very humble opinion, sinks their

boat."

126.

But Defendant Jenkins omitted from his communication the fact that every

chip run ordered from CMP was used for research upon which students and/or

researchers affiliated with Georgia Tech based scholarly papers, presentations,

masters theses and/or doctoral dissertations.

127.

Chang-Ho Lee, a researcher affiliated with Georgia Tech's School of

Electrical and Computer Engineering, stated by sworn affidavit that he co-authored

scholarly papers and presentations based on research obtained from several CMP

chip runs including CMP chip runs GT_Apr 2007 and GT_Jan2007.

128.

Matthew Leung, a researcher affiliated with Georgia Tech's School of Electrical and Computer Engineering, stated by sworn affidavit that he co-authored scholarly papers and presentations based on research obtained from several CMP chip runs including CMP chip runs GT_Apr2007, GT2_Jul2007, GT1_Jan2008, GT3_Jan2008, GT1_Apr2008, GT2_Apr2008, GT3_Apr2008, GT_May2006, GT2_Jan2008 and GT_Oct2008.

129.

David Yeh, a researcher affiliated with Georgia Tech's School of Electrical and Computer Engineering, stated by sworn affidavit that he co-authored scholarly papers and presentations based on research obtained from several CMP chip runs including CMP chip runs GT_Sept2006, GT_May2006, GT_Jan2007, GT_Apr2007, GT1_Jul2007, GT2_Jul2007, GT1_Jan2008, GT2_Jan2008, GT3_Jan2008, GT1_Jul2008, GT2_Jul2008, GT3_Jul2008, GT1_Apr2008, GT2_Apr2008, GT3_Apr2008 and GT_Oct2008.

130.

Defendant Allen testified under oath that there were certain circumstances in which it was entirely appropriate to use unrestricted funds to pay for the production of chips that would be used by Georgia Tech students in published reports, in

research dissertations, or in publications authored by Georgia Tech faculty members.

131.

Importantly, Professor Hasler's sworn statement reported that "it is standard practice and procedure" for Georgia Tech "to use unrestricted funds, VentureLab funds, and gifts to pay for research in the fabrication of building block and prototype chips to be used in student dissertations and faculty peer review journals and other publications and presentations."

132.

Georgia Tech later admitted, in response to formal Requests for Admission served upon it in pending litigation, that Georgia Tech had conducted no investigation into whether student Master thesis submissions and doctoral dissertation presentations had been based on, had referenced, or had included any intellectual property related to computer chips manufactured by CMP for Georgia Tech, GEDC or Sayana. Georgia Tech further admitted that, prior to suspending Dr. Laskar, it had not conducted an investigation into whether any computer chips manufactured by CMP had been sold or would be the subject of a scientific or academic publication, including without limitation conference papers or journal articles authored or co-authored by any employee or student of Georgia Tech.

133.

Before Georgia Tech suspended Dr. Laskar without pay and the GBI

conducted its coordinated raids on May 17, 2010, Georgia Tech made no analyses,

reports, determinations, studies, interviews, audits or other public records

regarding whether the chips fabricated by CMP were solely for academic purposes,

solely for provision of prototypes to ETRI and Microsoft, or for both purposes

dually. The Board of Regents of the University System of Georgia (of which

Georgia Tech is an organizational unit) responded "Georgia Tech has no

responsive documents," to the following five Georgia Open Records Act

("GORA") requests:

> **GORA Request No. 6:** *All,* if any analyses, reports, determinations, studies, interviews, audits or other public record prepared by or for Georgia Tech at any time to ascertain or determine as a matter of fact how many chips fabricated by CMP were ***solely*** for academic purposes, *i.e.*, doctoral dissertations, masters theses, presentations or scientific papers;

> **GORA Request No. 7:** *All,* if any analyses, reports, determinations, studies, interviews, audits or other public record prepared by or for Georgia Tech before . . . May 17, 2010 to ascertain or determine as a matter of fact how many chips fabricated by CMP were ***solely*** for academic purposes, *i.e.*, doctoral dissertations, masters theses, presentations or scientific papers;

> **GORA Request No. 8:** *All,* if any analyses, reports, determinations, studies, interviews, audits or other public record prepared by or for Georgia Tech to ascertain or determine as a

matter of fact how many chips fabricated by CMP were for academic purposes ***and the dual purpose*** of providing prototype – not for commercial sale – chips for ETRI or Microsoft;

**GORA Request No. 9**: *All,* if any analyses, reports, determinations, studies, interviews, audits or other public record prepared by or for Georgia Tech to ascertain or determine as a matter of fact how many chips fabricated by CMP were ***solely*** and only for the purpose of providing prototype – not for commercial sale – chips for ETRI or Microsoft; and

**GORA Request No. 10**: *All,* if any analyses, reports, determinations, studies, interviews, audits or other public record prepared by or for Georgia Tech to ascertain or determine as a matter of fact how many different or separate chips actually are contained in each "tape out" or fabrication by CMP.

134.

In point of fact, every CMP chip production (referred to as a tape run) identified by Defendants had generated published peer-review journal articles, conference papers, and dissertations. These production tape runs included chips which ETRI received. At least 35 dissertations prepared by Georgia Tech doctoral candidates were in some manner or way related to these tape runs.

**Misrepresentations Made About The Falsification Of A Chip Invoice**

135.

Defendant Hurd testified under oath and before a representative of the Attorney General's office that Dr. Laskar had caused a Georgia Tech employee named Cathy Beam to falsify a quote pertaining to CMP chip production.

136.

Yet, Defendant Hurd later admitted under oath that Ms. Beam did not inform him that Dr. Laskar had told her to falsify a quote.  Defendant Hurd testified and admitted that he had found no evidence showing that Dr. Laskar had directed or instructed anyone to falsify an invoice. He also testified and admitted that an employee in Georgia Tech's Internal Audits department interviewed Ms. Beam, and that a transcript of that interview recorded Ms. Beam's report that "Chris [Evans] told me to make up a quote."

137.

During Stephane Pinel's Georgia Tech faculty hearing regarding his dismissal from Georgia Tech, Defendant Jenkins testified that an exhibit presented to him reflected "the fake quote that was forged by Kathy [sic] Beam upon direction of Chris Evans and, I believe, Dr. Laskar."

138.

Ms. Beam was questioned on more than one occasion by the GBI.  She never reported to the GBI that Dr. Laskar had instructed or requested her to falsify a quote.

139.

In a hearing before The Honorable Robert McBurney of the Superior Court of Fulton County on January 26, 2016, Ms. Beam testified that Chris Evans had instructed her to create the quote.

**Misrepresentations That Sayana Transmitted Georgia Tech Intellectual Property For Which Sayana Had No License Extending To ETRI**

140.

In the 2010 Report, Defendant Hurd stated that Sayana delivered to ETRI intellectual property that may have been Georgia Tech's property.

141.

In April 2010, during a meeting lasting several hours, Defendant Hurd made PowerPoint presentation to Mr. McLaughlin, representatives of Georgia Tech and the Office of Internal Audit for the Board of Regents. The slides from Defendant Hurd's presentation accuse Sayana of delivering intellectual property to ETRI that may have been Georgia Tech's property.

142.

Defendant Hurd testified under oath and before a representative of the Attorney General's office that Sayana had a contract with the GTRC pursuant to which it licensed certain intellectual property in existence in 2006, but that Sayana had filed and used 14 additional patents covering intellectual property belonging to Georgia Tech and for which Sayana had been granted no license. Defendant Hurd cited Mr. Wozniak as the source of his information. Defendant Hurd acknowledged that he had not questioned Dr. Laskar about this.

143.

Defendant Hurd testified under oath and before a representative of the Attorney General's office that Sayana had given or sold intellectual property or things to ETRI that it was not licensed to use and that Dr. Laskar had permitted ETRI employees to visit Georgia Tech laboratory facilities where they were exposed to Georgia Tech intellectual property.

144.

Yet, Defendant Hurd later admitted under oath that ETRI had a separate contract with Georgia Tech allowing it to access GEDC labs, and that other companies, including Microsoft, Texas Instruments, AT&T and Hewlett Packard, all had similar contracts with Georgia Tech which allowed them to access GEDC labs.

145.

Defendant Hurd later admitted under oath that he had not investigated whether any of the information provided to ETRI was derived from publicly available articles discussing 60 GHz research.

## Misrepresentations That Dr. Laskar Defrauded ETRI

146.

During the aforementioned meeting in April 2010, Defendant Hurd made a PowerPoint presentation to Mr. McLaughlin, representatives of Georgia Tech and the Office of Internal Audit for the Board of Regents and presenting slides which accused Dr. Laskar of defrauding ETRI.

147.

Defendant Hurd reported to Agent Vorrasi that Dr. Laskar had deceived ETRI.

148.

Defendant Hurd testified under oath and before a representative of the Attorney General's office that Sayana "couldn't provide the exact chips, so they took other chips [owned by Georgia Tech] to fool ETRI's accounting . . . they sent to ETRI the other chips that they wanted to just fool their accounting so they could get payment." There was and there is no evidence to substantiate this charge.

149.

Sayana employees Bevin Perumana, Saikat Sarkar and Padmanava Sen, all
testified when deposed by Mr. McLaughlin on June 24, 2010 that Sayana files
labeled "fake" indicated only that these files were *preliminary* layouts and not
final layouts. They all further testified that the "fake" designation was used only to
distinguish between preliminary and final layouts and had nothing to do with the
authenticity of the files.

**Misrepresentations That Georgia Tech Had Strict Policies and Procedures
Regarding Faculty Members' Public and Private Work**

150.

Defendant Hurd reported to Agent Vorrasi that strict policies and procedures
existed at Georgia Tech to control how faculty members "blend[]" their "public
and private" work. But the testimony of Defendant Hurd and others demonstrates
that this is not true.

151.

Steve Cross, the Executive Vice President for Research at Georgia Tech,
told Kwang Wook Bae, an executive at Samsung, that what had happened with Dr.
Laskar occurred because Georgia Tech and the GTRC did not have well
established rules in place and that they were working to establish guidelines.

152.

Defendant Mark Allen told Mr. Bae that what happened with Dr. Laskar occurred because Georgia Tech and the GTRC did not have well established rules in place and that they were working to establish guidelines.

## Misrepresentations Made About A Theft of Resources

## Including Employees from Georgia Tech

153.

Defendant Hurd reported to Agent Vorrasi that Dr. Laskar used his position at Georgia Tech to steal resources from Georgia Tech including employees.

154.

Defendant Hurd testified under oath and before a representative of the Attorney General's office that he reached e conclusion that Sayana compelled students who were paid by Georgia Tech to work 100% of their time for ETRI based on his review of a Collaborative Research Agreement between Sayana and ETRI.

155.

Defendant Hurd further testified that he did not know whether the term "load" used in the Collaborative Research Agreement signified a percentage of (a) any and all time the worker could work during a 24-hour day, or (b) the time the

worker could work for Sayana outside of the worker's other professional
commitments.

156.

Defendant Hurd testified that he never contacted ETRI to ask what the term
"load" meant in the context of the Collaborative Research Agreement. When the
hearing Chairman sought to clarify what Defendant Hurd did and did not know
about the meaning of the term "load," and asked "this issue about well, were they
doing their day a week or other things, that is still sort of cloudy right now,"
Defendant Hurd responded, "That, that is cloudy."

157.

Defendant Jenkins testified under oath and before a representative of the
Attorney General's office that he never contacted anybody at ETRI to ask what the
term "load" meant in the context of the Collaborative Research Agreement because
he "thought it was self-explanatory." He further testified that the term "load" was
nowhere defined in the Collaborative Research Agreement.

158.

In a sworn statement read into the record at Dr. Laskar's faculty hearing on
March 30, 2011, Mr. Wooyong Lee testified that "As part of its Collaborative
Research Agreement with ETRI, Sayana designated Dr. Joy Laskar, Dr. Stephane
Pinel, Dr. Kyutae Lim, Dr. Saikat Sarkar, Sen Padmanava and R. Mukhopadhyay

as members of its research team and agreed that those persons would spend a set percentage of the time each was permitted to work for Sayana on our project. ETRI understood that the individuals identified . . . were not full-time employees of Sayana and thus would not be able to spend all of their time on our collaborative research projects. For example, ETRI understood that by stating Saikat Sarkar would work a hundred percent load, that Sayana was agreeing only that all of Sarkar's time with Sayana would be spent on our joint project."

## Actions By Defendants In Conjunction With The Wrongful Suspension Of Dr. Laskar

159.

On May 18, 2010, one day following a GBI raid conducted at Dr. Laskar's home, and following raids conducted at 20 other locations, Georgia Tech proceeded to suspend Dr. Laskar from his position of employment at Georgia Tech, and to do so without pay.  Mr. Stephen Fleming, then Vice President of Georgia Tech, sent an e-mail to Georgia Tech faculty members describing the policies and procedures for the use of Georgia Tech facilities and resources by start-up companies. Mr. Fleming wrote, in part, "I'm sure you've all seen the news reports about a potential misuse of resources at one of our campus research centers . . . Some of you have reached out to us expressing concern about your own

research and commercialization activities." He encouraged those who were concerned they might have violated a rule to contact a specified Georgia Tech employee to discuss the matter. Defendant Jilda Garton testified under oath and before a representative of the Attorney General's office that Mr. Fleming's e-mail had been sent "because we were asked a number of questions. And folks wanted us to clarify and make sure that those policies and procedures were articulated for people who were asking those questions." In other words, because of historical practices and procedures, members of the Georgia Tech community wanted to understand if the actions of their member companies were now in question.

160.

After search warrants were secured by Agent Vorrasi on the basis of her Affidavit and information supplied to her by Defendant Hurd, she conducted a briefing on Friday, May 14, 2010 with approximately 25 individuals who would participate in the execution of the search warrants. These 25 people included GBI agents, Georgia Tech Department of Public Safety Officials, and Georgia Tech Internal Audit employees. On Monday May 17, 2010. GBI raids then occurred at 21 locations. Defendant Jenkins testified under oath that GBI officials wore Kevlar vests and had their guns drawn when executing the warrants.

161.

Every single item seized during the GBI raids was released to the Georgia

Tech Internal Audit Department and stored in a building on the Georgia Tech

campus in Atlanta, Fulton County, Georgia. Defendant Hurd personally signed the

documentation recording many of these releases of evidence from the GBI to

Georgia Tech Internal Audits. The items seized included many non-technical items

such as a passport seized from Stephane Pinel's bedroom, Delta Airline tickets

seized from his office, six U.S. passports and Indian currency seized from Dr.

Laskar's home, and bits of paper with handwriting on them dug out of trash cans.

162.

Melissa Hall, an employee of Georgia Tech's Internal Auditing,

subsequently accompanied Agent Wesley Horne to receive equipment regarding 60

GHz technology from Georgia Tech employee Dr. Stephen Ralph. That equipment

was also released to Georgia Tech's Internal Auditing.

163.

At approximately 8:30 am, May 17, 2010, nine law enforcement officials

(including four GBI agents and five Cobb County Police Department officers)

began their raid of Dr. Laskar's home. The raid lasted approximately four hours.

During the course of the raid, investigators destroyed a project Dr. Laskar's seven-

year old daughter had made for school.

164.

When the raid was begun at his home, Dr. Laskar was completely unaware.
He was at that moment in time on the Georgia Tech campus. GBI Special Agent
Lisa Vorrasi approached Dr. Laskar on campus and tried to question him. She told
him that she wanted to search his vehicle. Dr. Laskar then accompanied Agent
Vorrasi and another GBI agent to a parking deck located on the Georgia Tech
campus. Although Agent Vorrasi's search warrant for Dr. Laskar's vehicle listed
the wrong model, Dr. Laskar nevertheless unlocked his car to make it available for
her inspection.

165.

When Agent Vorrasi seized Dr. Laskar's computer from his vehicle, Dr.
Laskar provided her with the login in and password information to allow her to
access the information thereon.

166.

Prior to these raids, Dr. Laskar was never questioned by Georgia Tech's
Internal Auditing Department. As of February 15, 2010, Larry Webster, an
employee of the Department, had thought Internal Auditing planned to question
Dr. Laskar before commencing its raids. Even Defendant Allen encouraged
Defendant Hurd to meet and discuss matters with Dr. Laskar.  Defendant Hurd
refused to do so.

167.

During some of the GBI's raids, employees of Georgia Tech's Internal

Auditing department accompanied law enforcement officials. Terry Nolan, the

Associate Director of Internal Auditing at Georgia Tech, accompanied law

enforcement officials on their raid of Sayana's offices at 75 Fifth Street, NW, Suite

310, Atlanta, Fulton County, Georgia and their raid Dr. Laskar's office on the

Georgia Tech campus.

**Defendants Jenkins Joined Prosecutors In Formally**

**Questioning Sayana Employees**

168.

On June 24, 2010, Sayana employee Bevin Perumana was deposed by

Senior Assistant Attorney General McLaughlin in the presence of Special Agent

Vorrasi.  Defendant Patrick Jenkins was present at Mr. Perumana's deposition.

During the deposition, Defendant Jenkins spoke on the record and questioned Mr.

Perumana directly.

169.

On June 24, 2010, Sayana employee Saikat Sarkar was deposed by Mr.

McLaughlin, again in the presence of Special Agent Vorrasi and Defendant

Jenkins. During the deposition, Defendant Jenkins spoke on the record and questioned Mr. Sarkar directly.

170.

On June 24, 2010, Sayana employee Padmanava Sen was deposed by Mr. McLaughlin in the presence of Special Agent Vorrasi and Defendant Jenkins. During the deposition, Defendant Jenkins spoke on the record and questioned Mr. Sen directly.

171.

Defendant Jenkins assisted GBI Agent Lisa Vorrasi with her questioning of witness Romain Pelard.

172.

Defendant Patrick Jenkins assisted GBI Agent Lisa Vorrasi with her questioning of witness Angelika Braig.

173.

Defendant Jenkins assisted GBI Agent Lisa Vorrasi with her questioning of witness Edward Gebara.

174.

Defendant Jenkins assisted GBI Agent Lisa Vorrasi with her questioning of witness Carl Rust.

175.

Defendant Jenkins assisted GBI Agent Lisa Vorrasi with her questioning of witness Kyutae Lim.

176.

Defendant Jenkins assisted GBI Agent Wesley Horne with his questioning of witness Joi Adams.

177.

Defendant Jenkins assisted GBI Agent Wesley Horne with his questioning of witness Debasis Dawn.

178.

Defendant Jenkins assisted GBI Agent Wesley Horne with his questioning of witness David Yeh.

179.

Defendant Jenkins assisted GBI Agent Wesley Horne with his questioning of witness Cathy Beam.

180.

After the GBI questioned Paul Freet, the Principal at VentureLab, Mr. Freet observed that almost all of the questions were asked by the Georgia Tech Internal Audit employees, not the GBI agents. Georgia Tech employees appeared to be

running the interview and those Georgia Tech Internal Audit employees questioning him were not familiar with VentureLab or the spin-out process.

181.

On March 17, 2011, Jessica Sentz, a licensed attorney then working in Georgia Tech's Office of Legal Affairs wrote to Mr. McLaughlin in the Attorney General's Office: "[W]e wanted to know how to approach him [Patrick Jenkins] as a WTN [witness] because of his wearing two hats: GT employee and GBI agent (I use the term 'agent' loosely). He's going to be our star WTN [witness] and we want to keep a Chinese firewall between what he knows as GT EE and what he knows as a 'helper' to GBI. Can we call you . . . for the answers to those questions?"

182.

Defendants were closely involved with state law enforcement and investigative authorities.

**GBI Warrants Were Executed On The Day The Sayana Auction Sale Was Scheduled To Occur, Causing That Sale To Be Cancelled**

183.

Sayana Wireless LLC had paid $50,000.00 to Pagemill Partners in order to effectuate the sale of Sayana by private auction. Pagemill Partners is a Silicon

Valley technology investment bank specializing in the sale of electronic design companies.

184.

Seventeen (17) different companies had conducted an investigation of Sayana and were identified as potential bidders.  Pagemill Partners had advised Sayana that it anticipated an auction price for Sayana of more than $30 Million.

185.

The auction was scheduled to begin on May 17, 2010.

186.

On the morning of May 17, 2010, the Georgia Bureau of Investigation, in furtherance of criminal charges reported, approved, assembled and communicated by Defendants, raided the homes of Dr. Laskar and Dr. Pinel, their offices at Georgia Tech, and some 20 other locations.  The personal and professional items, incuding computers, seized in this raid have never been returned to Dr. Laskar and his family, notwithstanding the dismissal of all charges against him.  Many of the items taken were highly personal in nature.

187.

Assisted by emails and press releases planned, orchestrated and disseminated by Defendants and those to whom they reported at Georgia Tech, the events described were covered intensely by members of the news media.  Pagemill

78

Partners was forced to halt the auction of Sayana.  As a consequence of the auction being cancelled, Sayana lost millions of dollars in sales proceeds.

188.

Dr. Laskar was deprived of millions of dollars in anticipated transaction proceeds. As holder of a 10% member interest in Sayana, the Georgia Tech Research Corporation also lost millions of dollars in proceeds.  Defendants regarded it to be more important to act maliciously toward and against Dr. Laskar than to preserve and protect the benefits available to GTRC.

189.

On December 30, 2014, Dr. Laskar was criminally indicted for racketeering and theft in connection with the purchase by Georgia Tech of CMP computer prototype chips.

190.

On October 5, 2016, The Honorable Robert McBurney of the Superior Court of Fulton County dismissed all claims presented and filed against Dr. Laskar, terminating that legal proceeding in Dr. Laskar's favor.

## SECTION 1983 CLAIM FOR MALICIOUS PROSECUTION

191.

The allegations contained in paragraphs 1 through 190 of Plaintiff's

Complaint are incorporated herein by reference as if each said paragraphs was

restated and re-alleged in its entirety.

192.

*Title 42 U.S.C. § 1983* provides in pertinent part:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress.

193.

At all times relevant to the material events described in this Complaint,

Plaintiff was a citizen of the United States of America and a person within and

subject to its jurisdiction.  All of the named Defendants were persons acting under

color of a state and state law as that conduct is described in *42 U.S.C. § 1983*.

194.

At all times relevant hereto, the Defendants acted under the color of state

law when acting within the scope of their employment and as employees of an arm

of the state of Georgia, the Board of Regents of the University System of Georgia,

the state-owned Georgia Institute of Technology, and that Institute's affiliated

entities. All of the Defendants performed the acts and omissions described in this

Complaint within the scope of their official duties and employment.  However, the

claims stated herein are not stated against the Defendants in their official

capacities; rather, all claims are asserted against them in their individual and

personal capacities.

195.

Defendants attempted to influence a criminal investigator and criminal

prosecutor by knowingly providing false, incomplete and misleading information

regarding Plaintiff and his actions. Defendants are liable for maliciously

instigating, initiating, advancing, facilitating and pursuing the criminal prosecution

of Plaintiff and without probable cause.

196.

Defendants, by providing false, incomplete, and/or misleading information

about Plaintiff and the facts and circumstances surrounding his conduct while he

worked for and on behalf of Georgia Tech, GEDC, Sayana, GTRC, and in support

of students whom he mentored and advised, acted maliciously and without

probable cause when recommending, requesting, referring, suggesting, and

directing the initiation of a criminal prosecution of Plaintiff through the provision

of false and misleading information.

197.

Defendants' actions resulted in, led to, and caused the criminal prosecution of Plaintiff for two counts of racketeering and premised upon the underlying crimes of theft by taking. *O.C.G.A. §§ 16-14-4(a) and (b)*. On October 5, 2016, the criminal proceedings against Plaintiff were terminated in his favor. Under Georgia law, "[a] criminal prosecution which is carried on maliciously and without any probable cause and which causes damages to the person prosecuted shall give him a cause of action." *O.C.G.A. § 51-7-40*. The right of action accrues when the criminal prosecution is ended. *O.C.G.A. § 51-7-41*. A plaintiff may recover general damages as well as compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of society. *Heck v. Humphrey,* 512 U.S. 477, 484 (1994) Attorneys' fees incurred are recoverable. The Defendants' conduct constituted the tort of malicious prosecution of Plaintiff under principles of Georgia and federal law.

198.

As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and is entitled to recover, direct, consequential, special and other damages in an amount to be determined at a trial of this action.

199.

The actions and omissions of Defendants resulted in Plaintiff's arrest, in the wrongful and unlawful seizure of his private property and papers, and in the criminal prosecution of his person.  Dr. Laskar was deprived of his personal liberty, of his ability to secure gainful employment, and of his ability to support his family.  Dr. Laskar experienced and suffered the destruction of his career and his personal and professional reputation.  Defendants caused Plaintiff to suffer these damages in violation of the Fourth Amendment to the Constitution of the United States of America.

200.

Under governing Eleventh Circuit authority, it is established "with obvious clarity, that a government official is prohibited from intentionally providing false information to law enforcement without probable cause and thereby directly causing a Fourth Amendment violation." *Buckner v. Shetterley,* 621 F.Supp.2d 1300 (M.D. Ga. 2008).

201.

Defendants are not entitled to any sovereign, official or qualified immunity for their actions and omissions.  The violation by Defendants of Plaintiff's Fourth Amendment constitutional rights deprives them of any immunity they might otherwise claim.

202.

Plaintiff is entitled to the recovery of his reasonable attorneys' fees and costs

pursuant to *42 U.S.C. § 1988,* and to the recovery of pre-judgment interest and

costs as provided under federal law. Defendants have acted in bad faith, and

Plaintiff is additionally entitled to the recovery of his reasonable attorneys' fees

and expenses of litigation under and by virtue of *O.C.G.A. Section 13-6-11.*

203.

Defendants' actions were willfully undertaken, deliberately and maliciously

pursued, and evidenced by bad faith.  Defendants' actions constituted a willful and

wanton disregard for, and a violation of Plaintiff's Constitutional rights.

204.

The actions of Defendants evidence willful misconduct, malice, fraud,

wantonness, oppression, and an entire want of care sufficient to raise the

presumption of a conscious indifference to consequences.  Under and by virtue of

*O.C.G.A. § 51-12-5.1(b),* Plaintiff is entitled to an award of punitive damages in an

amount to be determined by the enlightened conscience of the jury.

205.

Plaintiff brings this action timely and in accordance with the relevant statute

of limitations.

**WHEREFORE**, Joy Laskar, Ph.D., respectfully prays and demands:

(1) that process issue as provided by law;

(2) that Plaintiff have judgment against Defendants for all recoverable direct, consequential and special damages arising under Count One of his Complaint;

(3) that Plaintiff have a recovery of pre-judgment interest;

(4) that Plaintiff recover his reasonable attorneys' fees and expenses of litigation;

(5) That Plaintiff recover punitive damages in an amount to be determined by the enlightened conscience of the jury;

(6) That all costs of this action be cast upon Defendants;

(7) That Plaintiff have a trial of this action before a jury of his peers;

(8) That the Court declare Defendants' conduct has violated the Fourth Amendment to the Constitution of the United States; and

(9) that Plaintiff have such other and further relief as this Court deems just and proper.

DATED: September 28, 2018.

Respectfully submitted,

*/s/ Michael A. Dailey*
Michael Alan Dailey
Georgia Bar No. 203250
Attorney for Plaintiff

**ANDERSON DAILEY LLP**
2002 Summit Boulevard
Suite 1250
Atlanta, Georgia 30319
404 442 1800 voice
404 442 1820 data
mdailey@andersondailey.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 5.1 of the Local Rules of the U.S. District Court for the

Northern District of Georgia, the undersigned certifies that the within and

foregoing Complaint was prepared in accordance with L.R. 5.1, N.D. Ga., using

Times New Roman font, 14 Point.

This 28th day of September, 2018.

> */s/ Michael A. Dailey*
> Michael Alan Dailey
> Georgia Bar No. 203250
> Attorney for Plaintiff
>
> **ANDERSON DAILEY LLP**
> 2002 Summit Boulevard
> Suite 1250
> Atlanta, Georgia 30319
> 404 442 1800 voice
> 404 442 1820 data
> mdailey@andersondailey.com