**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JOY LASKAR, PH.D.,<br><br>Plaintiff,<br><br>v.<br><br>PHILIP HURD, *et al.*,<br><br>Defendants. | CIVIL ACTION NO.<br>1:18-cv-4570-WMR |

**ORDER**

This matter is before the Court on Defendant Phillip Hurd and Patrick Jenkins' ("Defendants") Motion for Summary Judgment [Doc. 87]. For the reasons discussed herein, Defendants' Motion is **GRANTED**.

## I. BACKGROUND

### A. Georgia Tech Investigation

This case arises out of a dispute between a former Georgia Tech professor and Georgia Tech employees. Dr. Joy Laskar ("Plaintiff") was the Director of the Georgia Electronic Design Center ("GEDC") and a professor of engineering at Georgia Tech. [Doc. 19 at 1-2]. GEDC is a research center at Georgia Tech where private companies can collaborate with Georgia Tech researchers in exchange for paying membership dues to the center. [*Id.*].

Plaintiff and Stephanie Pinel, another full time Georgia Tech employee, founded Sayana, a private microchip design company. [*Id.* at 9]. At all times relevant to this action, Plaintiff maintained an ownership of greater than 25% in Sayana. [Docs. 87-2 at ¶ 41; 99 at ¶ 41]. Sayana designed microchips that were manufactured through a company called Circuits Multi-Projects ("CMP") at a foundry called ST Microelectronics. [Doc. 87-3 at ¶ 26]. Sayana had collaborative research agreements with the Electronics and Telecommunications Research Institute ("ETRI"), a government-funded research institute in South Korea. [*Id.*].

Defendant Philip Hurd and Defendant Patrick Jenkins (collectively, the "Defendants") were employees in the Auditing Department at Georgia Tech. [*Id.* at 1]. Defendant Hurd was the Chief Audit Executive of Georgia Tech's Department of Internal Auditing ("DIA"). [*Id.* at 2]. Defendant Jenkins worked for Defendant Hurd in the auditing team as a Senior IT Auditor. [Doc. 87-4 at. ¶ 2].

In December of 2009, the Associate Vice President for Research and General Manager of the Georgia Tech Research Corporation (the "Research Corporation") discovered an accounts receivable shortfall of more than $600,000. [Doc. 87-3 at 1-2]. The Research Corporation notified Defendant Hurd with an audit request in January of 2010. [*Id.*]. Defendant Hurd, with a team that included Defendant Jenkins, opened an audit into the GEDC cost overrun. [*Id.* at 3]. The audit was a "collaborative effort that involved all members of the audit team" as there was a high

volume of documents to review. [Docs. 87-3 at. ¶ 7; 87-4 at. ¶ 4]. The audit team reviewed emails, financial records, and contracts, as well as interviewed officials and financial staff at Georgia Tech and the Research Corporation. [*Id.*]. These efforts included a meeting with Plaintiff, where he confirmed his participation and involvement with Sayana. [Doc. 87-3 at ¶ 38]. Following the investigation, the Defendants concluded that the documents and other information they reviewed "raised significant concerns" about the private business activities of Plaintiff. [Doc. 87-1 at 3].

**B. GBI Investigation**

In April of 2010, Defendant Hurd sent an Official Report of Suspected Malfeasance (the "Report") to the Chief Audit Officer and Associate Vice Chancellor at the University System of Georgia. [Doc. 87-3 at. ¶ 14.]. Defendants claim that this Report accurately summarized Plaintiff's suspected malfeasance, detailing his involvement with Sayana and the alleged misuse of equipment and resources to further the interests of Sayana, and that he had violated Georgia Tech policy and statutory law. [*Id.*]. Plaintiff contends that that these findings in the Report are "misrepresentations." [Doc. 19 at 37].

After reviewing the report, the State of Georgia Senior Assistant Attorney, David S. McLaughlin, met for several hours with representatives from Georgia Tech, including Defendant Hurd, and from the Office of Internal Audit for the Board of

Regents to discuss the findings of the Report. [Doc. 19 at 38]. Following this meeting, McLaughlin sent a letter to the Director of the Georgia Bureau of Investigation ("GBI") to request a criminal investigation against Plaintiff. [Doc. 87-5 at 2-3].

The GBI opened an investigation against Plaintiff, and Agent Lisa Vorrasi was the lead case agent. [*Id.* at 3]. The President of Georgia Tech instructed Defendant Hurd "to make himself and the audit team available" to the GBI and McLaughlin, which included providing documents and other information upon request. [Doc. 87-3 at. ¶ 44]. Defendant Hurd placed the audit team on "litigation support" status, standard DIA procedure, where the team's role was to "assist Agent Vorrasi and McLaughlin at their direction, primarily by retrieving and providing documents for their review." [Docs. 87-3 at. ¶ 45; 87-4 at. ¶ 11].

Agent Vorrasi, with the support of McLaughlin, wrote two identical search warrant affidavits to be executed in Fulton and Cobb County. [Doc. 87-2 at ¶ 60.]. Defendant Hurd and his team provided the documents that McLaughlin and Agent Vorrasi reviewed before drafting the affidavits, but were not involved in drafting any portion of the affidavits. [*Id.* at ¶¶ 60-61]. Both McLaughlin and Agent Vorrasi concluded that there was probable cause to believe crimes had been committed by Plaintiff and Pinel and that evidence of the criminal activity could be found at the locations listed in the affidavits. [*Id.*].

Agent Vorrasi, accompanied by Defendant Hurd, presented an Affidavit in Support and Seizure Warrants to Fulton County Superior Court Judge Craig Schwall and another identical affidavit to Cobb County Superior Court Judge Adele Grubbs on May 14, 2010. [*Id.* at 17]. The search warrants related to the seizure of records concerning Sayana and chips from CMP at Georgia Tech's facilities, as well as at Laskar and Pinel's homes, in their vehicles, and on their persons. [*Id.*]. The judges authorized the search warrants. [*Id.*].

The GBI then executed the warrants at Georgia Tech and the homes of Plaintiff and Pinel on May 17, 2010. [*Id.*]. Defendant Jenkins accompanied GBI agents to the Technology Square Research Building that was to be searched; he was instructed by Agent Vorrasi to identify Georgia Tech employees and direct them to a room while the area was being searched. [*Id.*]. Agent Vorrasi attempted to interview Plaintiff while the search warrants were being executed, but as soon as Plaintiff indicated that he wanted to speak an attorney, she stopped the interview. [*Id.*].

The execution of the search warrants yielded an extensive body of evidence, including Sayana computers and business records. [*Id.* at 17-18]. The investigation continued with GBI agents interviewing Georgia Tech employees and McLaughlin deposing Sayana employees with Agent Vorrasi present; all interviews and depositions were attended by Defendant Jenkins. [*Id.*]. In June of 2010, McLaughlin

took the deposition of three Sayana employees who collectively confirmed that "Sayana was using Georgia Tech offices, chip design software, and laboratory facilities to operate its business, that the Sayana employees designed and developed chips that were fabricated through CMP at ST Microelectronics, and that Sayana sent chips to ETRI." [*Id.* at 16-17].

On September 22, 2010, Agent Vorrasi presented affidavits in support of warrants to arrest Plaintiff in the Magistrate Court of Fulton County, which were granted. [*Id.* at 18]. The arrest warrants stated there was probable cause to arrest Plaintiff for racketeering in violation of O.C.G.A. § 16-14-4(a) and (b), based upon the allegation that Plaintiff made false statements to Georgia Tech and stole money from Georgia Tech to pay for Sayana's debt through the purchase of certain microchips, through CMP. [*Id.* at 19]. Agent Vorrasi wrote the arrest warrant affidavits with McLaughlin, supported by findings from the GBI's investigation. [*Id.* at 20]. McLaughlin consulted with Georgia Tech and the Research Corporation, but not with Defendants Hurd or Jenkins. [*Id.*]. Plaintiff, whose counsel had a bond agreement with McLaughlin, voluntarily appeared at the Fulton County Jail before the arrest warrants were executed, where he spent several hours before being released. [*Id.*].[1]

[1] At the hearing on the Motion for Summary Judgment, Defendants' counsel described how law enforcement and or the prosecutors orchestrated a "perp walk" for the benefit of local media when the Plaintiff showed up unexpectedly early for his booking at the jail before the media was present. This allegation, if true, is disappointing.

On December 30, 2014, McLaughlin presented an indictment of Plaintiff to a grand jury, which returned a true bill. [*Id.* at 21]. The grand jury charged Plaintiff with two counts of racketeering, in violation of O.C.G.A. § 16-14-4(a) and (b). [*Id.*]. The case was later dismissed against Plaintiff in October of 2016 by Fulton County Superior Court Judge Robert McBurney because the charges were barred by the statute of limitations; the court did not reach the issue of probable cause. [*Id.*].

### C. Dismissal Proceeding

Around the same time as the presentation of the search warrant affidavits, Georgia Tech began dismissal proceedings against Plaintiff. [Doc 19 at 26]. Plaintiff was suspended from his position at Georgia Tech in May of 2010 and, shortly after, received notice that Georgia Tech intended to initiate dismissal proceedings and tenure revocation proceedings against him. [*Id.* at 27]. In October, Georgia Tech provided Plaintiff with a statement of charges against him, which included his alleged use of Georgia Tech monies and resources to benefit his own private company and his failure to disclose the full extent of Laskar's involvement in Sayana to Georgia Tech. [Doc 87-7 at 9]. Plaintiff responded to each charge and requested a termination hearing. [*Id.* at 10-20].

In March 2011, a termination hearing was held before a faculty committee. [Doc. 87-2 at 22]. After subsequent testimony and argument, the faculty committee sent a recommendation and final report to Georgia Tech's President, G.P. Peterson,

which detailed the committee's findings and "unanimous recommendation" what Plaintiff should be dismissed. [*Id.*]. Peterson sent Plaintiff a letter on May 14, 2011, which stated that he agreed with the committee's recommendation; he then revoked Plaintiff's tenure and terminated his employment. [*Id.* at 24]. Plaintiff appealed this decision to the Board of Regents of the University System of Georgia. He lost. [*Id.*].

## II. PROCEDURAL HISTORY

Plaintiff initially filed his Complaint in the Northern District of Georgia, Atlanta Division in September of 2018. [Doc. 1]. In his Complaint, Plaintiff alleged a federal malicious prosecution claim against Defendants Allen, Garton, Hurd, and Jenkins brought pursuant to 42 U.S.C. § 1983. Defendants filed their first Motion to Dismiss against the Complaint, to which Plaintiff responded with his First Amended Complaint in November of 2018. [Doc. 19]. In his First Amended Complaint ("Amended Complaint"), Plaintiff argued that his Fourth Amendment rights under the United States Constitution were violated by Defendants, who provided "false, misleading, and materially incomplete information" to law enforcement that "caused [Plaintiff's] criminal prosecution[.]" [Doc. 19 at 97].

Defendants filed their second Motion to Dismiss in December of 2018, and this Court granted the motion in April of 2019. [Docs. 21 and 30]. Plaintiff appealed the Court's Order in May of 2019. [Doc. 33]. The Eleventh Circuit Court of Appeals granted the appeal in part, but denied it in part; the Court affirmed the dismissal of

Plaintiff's claims against Defendants Allen and Garton, but reversed the dismissal of Plaintiff's claims against Defendants Hurd and Jenkins. [Doc. 37]; *Laskar v. Hurd*, 972 F.3d 1278 (11th Cir. 2020). The case was then remanded to this Court in September of 2020 as to Plaintiff's surviving claims. [Doc. 37].

In July of 2024, Defendants Hurd and Jenkins jointly filed a Motion for Summary Judgment seeking dismissal of the malicious prosecution claims against them. [Doc. 87]. It their Motion, Defendants argue that the record does not support Plaintiff's malicious prosecution claim, and that regardless, Defendants are entitled to qualified immunity. [*Id.*]. Plaintiff filed a Response in October of 2024, and Defendants filed a Reply in December of 2024. [Docs. 97; 115]. This Motion came before the Court for a hearing on December 17, 2024. [Doc. 116].

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if evidence suggests a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome

of the case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004).

The moving party bears the burden of demonstrating that there is no genuine issue of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party may satisfy its burden by "identifying…portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any" or by simply showing the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal punctuation omitted). However, the Court must view the facts in the light most favorable to the non-moving party. *Clark,* 929 F.2d at 608.

The burden shifts then to the non-moving party to demonstrate that there is an issue of material fact that precludes summary judgment. *Id.* A summary judgment motion may be properly opposed by any materials in the record "except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324. The moving party is entitled to summary judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

## IV. DISCUSSION

### A. Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim.

Plaintiff's malicious prosecution claim fails because he has failed to provide evidence to support a finding that Defendants violated his Fourth Amendment right. Even if Plaintiff had sufficiently plead his malicious prosecution claim, the case would still require dismissal because Defendants are entitled to qualified immunity.

#### 1. Plaintiff's malicious prosecution fails because Plaintiff has provided no evidence of malice.

To succeed on a malicious prosecution claim, a plaintiff must present both evidence of a violation of the Fourth Amendment right to be "free of unreasonable seizures" and "the elements of the common law tort of malicious prosecution." *Williams v. Aguirre,* 965 F.3d 1147, 1157 (11th Cir. 2020) (internal punctuation omitted). In asserting that a plaintiff's Fourth Amendment right was violated, he must show: "(1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Id.* at 1165. And "[u]nder the common-law elements of malicious prosecution, [a plaintiff] must prove that the officers 'instituted or continued' a criminal prosecution against him, 'with malice and without probable cause,' that

terminated in his favor, and caused damage to him. *Id.* at 1157 (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)).

If a plaintiff can establish that an official "intentionally or recklessly made [false] statements or omissions necessary to support the [arrest] warrant," and that "after deleting the misstatement[s], the [warrant] affidavit is insufficient to establish probable cause[,]" then he can prove the warrant was constitutionally infirm. *Id.* at 1165. A plaintiff at the summary judgment stage must assert that there is a genuine dispute as to whether the statements supporting the warrant were "intentionally false and not…a mistaken belief[.]" *Id.* "Negligent misstatements or omissions" do not violate the Fourth Amendment. *Paez*, 915 F.3d at 1287. A plaintiff must "identify affirmative evidence from which a jury could find" the official lied or recklessly misrepresented information; "general attacks upon [the] defendant's credibility" and conclusory allegations are insufficient. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see Williams,* 965 F.3d at 1165.

As an initial matter, this Court can only consider whether the arrest warrants and supporting affidavits were constitutionally infirm and not either of the search warrants.[2] Though in his Amended Complaint Plaintiff attempts to extend his

[2] Plaintiff does not object to the limitation of his claim to the arrest warrants, as his responsive briefing only address the issue of probable cause supporting those warrants. *See* [Docs. 97 at 33; 117 at 28]. However, the information Defendants provided to investigators that was used to obtain the search warrants and otherwise informed the investigation may be relevant in consideration of the existence of probable cause.

malicious prosecution claim to both the search and arrest warrants, the Eleventh Circuit's previous ruling on Plaintiff's case articulated that the "search and seizure of [Plaintiff's] property cannot give rise to a claim of malicious prosecution," but only a "warrant for his seizure" will suffice. *Laskar,* 972 F.3d at 1285 (citing as *e.g. Williams,* 965 F.3d at 1164). The Supreme Court has reached the same conclusion, opining that the "[t]he constitutional violation alleged" in a malicious prosecution suit and "type of unreasonable seizure" at issue is "arrest and detention of a person based on a criminal charge lacking probable cause." *Chiaverini v. City of Napoleon*, 144 S. Ct. 1745, 1750 (2024). Further, an arrest warrant often marks the "institut[ion]…[of] a criminal prosecution[,]" a necessary element of a common law malicious prosecution claim. *Williams*, 965 F.3d at 1157.

In the instant case, Plaintiff must show that Defendants Hurd and Jenkins intentionally or recklessly made misstatements or omissions necessary to support the arrest warrants; he has failed to do so. Plaintiff states in his Amended Complaint that Defendants "attempted to influence, instigate, and mislead a criminal investigator and prosecutor by *knowingly* providing false, misleading and materially incomplete information," asserting that Defendants provided the information maliciously. [Doc. 19 at ¶ 195] (emphasis added). Plaintiffs allege that the information provided to Agent Vorrasi by Defendants was the "result of a materially incomplete investigation"; thus, the information was intentionally or recklessly false "by virtue

of its understood lack of completeness." [Doc. 97 at 35]. Essentially, Plaintiff asserts that because Defendants were aware there should have been further investigation, any conclusions presented to Agent Vorrasi and McLaughlin were premature and thus intentionally or recklessly false.

The record evidence does not support that any information presented was intentionally false or otherwise fabricated, but Plaintiff's contention may be true that the investigation was "focused on where the funds were going" because the DIA was "limited on resources." [Doc. 104-1 at 139]. The question then is whether Defendants' presentation of information, knowing the investigation could have been more robust, amounts to a reckless statement or omission. However, "the difference between 'reckless' and merely 'negligent' disregard for the truth is not crystal clear" as the Eleventh Circuit has not "staked out a bright line" *Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir. 1994). In the narcotics context, where an officer stated that he had observed marijuana to obtain an arrest warrant, but had only smelled the marijuana, the Fifth Circuit[3] deemed the misstatement "merely negligent." *United States v. Astroff*, 578 F.2d 133, 134–35 (5th Cir.1978). Though, where an officer obtained an arrest warrant by stating a defendant possessed cocaine, when the officer

[3]"We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

had received prior a lab report that indicated the substance was not cocaine, the Eleventh Circuit determined that the misstatement was recklessly made. *Kelly*, 21 F.3d at 1554.

Plaintiff asserts that because "important evidence went deliberately undiscovered", the results of the audit by Defendants could not be "factually supported." [Doc. 97 at 16]. Simply because those findings presented may not paint the full picture Plaintiff insists occurred, Defendants are in no way required to investigate in perpetuity to additionally provide Agent Vorrasi and McLaughlin "[Plaintiff's] own criminal defenses." [Doc. 87-1].[4] Plaintiff does not contend that the Defendants did not investigate and review countless documents concerning Plaintiff and Sayana; rather, Plaintiff asserts that their resulting assessment was so grossly unfounded it amounted to a recklessly false statement. Defendants' conclusions from the audit, even if the audit was conducted with a more limited scope than Plaintiff would've preferred, are at most "merely negligent" given the breadth of knowledge Defendants were able to rely upon.

Even if the statements Defendants provided were intentionally or recklessly false, the warrants contained sufficient information to establish probable cause. *See Williams,* 965 F.3d at 1165. Though Agent Vorrasi and McLaughlin were provided

[4] It bears noting, again, that the prosecution of the Plaintiff was terminated on procedural grounds, not because of a finding in his favor on the merits.

with the Report from Defendants, and despite Defendants' involvement with portions of the investigation and depositions, Defendants' statements were not "necessary to support the warrant." *Id.* Agent Vorrasi, who created the arrest warrants with McLaughlin, stated that the arrest warrant affidavits "were based on GBI's investigation, my and McLaughlin's independent review of the evidence, and our own conclusions based on that evidence." [Doc. 87-5 at 3]. During the months-long investigation, Agent Vorrasi and McLaughlin were given the same records that Defendants reviewed, but they also reviewed the "body of evidence" uncovered from execution of the search warrants and deposed Sayana employees. [*Id.* at 3-5].

The affidavits in support of the arrest warrants evidence the alleged acts of theft by detailing payments from Georgia Tech to CMP over several years. [Doc. 87-5 at 320]. Defendant Hurd's Report, though it discusses potential theft, does not even mention CMP by name. [Doc. 87-3 at 24]. Just because Agent Vorrasi and McLaughlin ultimately reached the same conclusion as Defendants, which is reasonable considering they all had access to the same plethora of information, does not mean Defendants' statements were necessary to support the warrant. Given that probable cause is "not a high bar" and "requires only a probability or substantial chance of criminal activity," it is met by the affidavits because it details Plaintiff's alleged acts of theft. *Paez*, 915 F.3d at 1287 (internal quotations omitted).

Plaintiff has not presented evidence in the record that the Defendants knowingly or recklessly provided false or materially incomplete statements in the arrest warrants Agent Vorrasi and McLaughlin submitted, nor was he able to present evidence that the warrants were devoid of probable cause without those statements. Therefore, Plaintiff's malicious prosecution claim against Defendants Hurd and Jenkins are DISMISSED.[5]

**2. Defendants are entitled to qualified immunity because they did not violate a clearly established right.**

In their Motion, Defendants argue that the federal claims against them in their individual capacities for malicious prosecution should be dismissed as they are entitled to qualified immunity. [Doc. 87 at 13]. Qualified immunity shields governmental officials from individual liability resulting from their discretionary acts, provided that "their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

Government officials have "the burden to establish that they were acting within their discretionary authority" when raising a qualified immunity defense.

---

[5] Plaintiff also would be unable to provide record evidence to support the remaining elements of malicious prosecution. There is no evidence of malice or a lack of probable cause on the record as detailed in this Order. But, this Court has doubts that Defendants instituted a criminal proceeding against Plaintiff because they did not draft the affidavit used to obtain the arrest warrant.

*Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). If officials can satisfy this burden, the onus is then on the plaintiff to establish that "the defendant violated a constitutional right" when the wrongful act occurred and "the violation was clearly established." *Christmas v. Harris County*, 51 F.4th 1348, 1354 (11th Cir. 2022) (internal punctuation omitted).

While an official's burden is not difficult to satisfy, the plaintiff's burden is "not [so] easily discharged[.]" *Foy v. Holston,* 94 F.3d 1528, 1533 (11th Cir. 1996). To illustrate the breadth of qualified immunity, the United States Supreme Court has opined that it "provides ample protection to all but the plainly incompetent or the those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A government official acts within his discretionary authority if the challenged actions or inactions "are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

As Defendants articulate in their Motion, they were acting "in their capacities as Georgia Tech auditors and employees" when they conducted an audit and sent the Report with their findings to the relevant authorities. [Doc. 87 at 31]. Defendants Hurd and Jenkins were employed in the Auditing Department at Georgia Tech. Their review of the information related to Plaintiff and Sayana, as well as the submission of the Report to McLaughlin, is consistent with the responsibilities of their positions

within that department. Defendants also state that being placed on litigation support status for the pending investigation was "standard [DIA] procedure once an investigation had been turned over to law enforcement[,]" which included assisting Agent Vorrasi and McLaughlin "at their direction." [Doc. 87-4 at ¶10].

As Defendants have sufficiently demonstrated that their acts were within their discretionary authority, the burden then shifts to Plaintiff to assert that Defendants violated a clearly established constitutional right.[6] *See Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Plaintiff, in bringing his malicious prosecution claim, has alleged a violation of his Fourth Amendment right; so he must demonstrate that Defendants had "fair notice that their conduct would violate federal law." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007). To show a violation of clearly established law, Plaintiff can point to either: "(1) earlier case law from the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of Defendant's conduct." *Id.*

[6] Plaintiffs do not dispute that Defendants were acting within their discretionary authority. *See* [Docs. 97 at 35-38; 117 at 6].

Defendants correctly articulate in their Motion that "[t]here is no United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court that clearly establishes that Hurd and Jenkins' conduct … amounts to a violation of clearly established law." [Doc. 87-1 at 33]. Plaintiffs concede this point, but argue that although "Defendants are not law enforcement officials[,]" the Defendants were sufficiently on notice that their alleged wrongful conduct could amount to a violation of a constitutional law. [Doc 97 at 37]. Indeed, a case need not be "'on all fours' with materially identical facts" to put an official on alert and even "notable factual distinctions" may still give "reasonable warning that the conduct at issue violated constitutional rights." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004); *United States v. Lanier*, 520 U.S. 259, 269 (1997).

Plaintiff asserts that Defendants were fairly noticed that the dissemination of intentionally and recklessly false information was a violation of his Fourth Amendment right. Plaintiff rests his assertion on cases that feature a law enforcement officer as the one who both drafts the affidavit and obtains the arrest warrant. *See* [Doc. 97 at 37-38]. The Constitution prohibits a law enforcement officer from "making perjurious or recklessly false statements in support of a warrant." *Kelly*, 21 F.3d at 1554. However such false statements must be necessary to establish probable cause or "the sole basis asserted for probable cause" in the arrest warrant affidavit. *Jones v. Cannon*, 174 F.3d 1271, 185 (11th Cir. 1999).

In consideration of the arrest warrant at issue in this case, it is clear that the existing circumstances are noticeably different from the case law that analyzes qualified immunity in the context of law enforcement officers. Defendants here are not law enforcement officers, so even assuming their statements were intentionally false (which the Court does not conclude), they were not the ones who ultimately decided whether to use that information in the affidavits supporting the warrants. Nor is it the case that the allegedly faulty information was the "sole basis" for probable cause; Agent Vorrasi also relied upon information from thousands of pages of documents, records, and depositions from Sayana employees. *See* [Doc. 97 at 25]. Although Defendants may have participated in certain stages of, and assisted with, the investigation, it does not logically follow that they ought to be subject to the same constitutional guiderails as law enforcement officials.

Plaintiff seems to assert that because Defendants had such an active role in the investigation, they functioned more like investigators; thus, Plaintiff argues that the law enforcement case law is sufficient to have fairly noticed Defendants that their conduct would violate the Constitution. The Eleventh Circuit has previously granted qualified immunity to an investigator who, under similar circumstances to Defendants in the instant case, had not "caused [plaintiff's] arrest and prosecution" because he had not prepared or obtained the arrest warrant and only provided information that was ultimately utilized in said warrant. *Rich v. Dollar*, 841 F.2d

1558, 1566 (11th Cir. 1988). Even if this Court were to construe the law enforcement case law against Defendants, it would be consistent with that case law to shield them from liability. Therefore, Defendants are entitled to qualified immunity.

## V. CONCLUSION

Plaintiff's federal malicious prosecution claim is dismissed. For the reasons discussed herein, Defendant's Motion for Summary Judgment [Doc. 87] is **GRANTED**. The case is **DISMISSED** and the Clerk is ORDERED to close the case.

**IT IS SO ORDERED**, this 14th day of March, 2025.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE